ROBERT W. WATERMAN ET AL.

v.

PHILANDER M. ALDEN ET AL.

*Administration—Trusts—Duties and Obligations of Executors and Trustees—Banks—Rights of Stockholders—Profits—Income or Principal —Costs—Circuit Court—Jurisdiction of.*

1. Where persons act in the dual capacities of executors and trustees, and in law are distinguished as separate persons in their separate capacities, it is their duty as trustees to collect and receive what might become due to them as such, without loss or diminution by their neglect, and to that end they should keep a watchful eye on the sources of the fund.

2. The source of the fund in question being in the administration of the estate, the personal estate vesting in the executors, the trustees could only take through the executors in the distribution of the estate in the County Court. The trustees had no title to the claims or stocks, and could neither collect the one nor sell the other. It was the duty of the executors to collect the claims and convert the property into money, and render a just and true account to the County Court as required by law. Such court had full power and jurisdiction to call them to account, and to charge them with all losses accruing through their neglect or misconduct.

Waterman v. Alden.

3. Upon final settlement, parties interested are entitled to notice and have a right of appeal, and in case there is no appeal, the adjudication is binding on all, and settles the relative rights of the parties.

4. While the conduct of parties as executors, as well as trustees, may be a proper subject of inquiry in determining as to their removal, the County Court has jurisdiction of their accounts as executors, and that jurisdiction is exclusive, unless in a proper case it should be superseded by the Circuit Court under the general chancery jurisdiction. It may be so superseded, but only where the court has jurisdiction of all the parties in interest, and for special reasons, showing that the administration should be withdrawn from the County Court, and then only by taking cognizance of the whole administration.

5. The maxim, that equity will treat that as done which ought to have been done, only operates in favor of one who holds an equitable right to have the thing done as against the one upon whom the duty of doing the thing has devolved, and only treats that as done which ought to be done. In the case presented, the duty of doing the collecting and distributing devolved upon the executors, and the jurisdiction to determine whether the acts claimed ought to have been done, was in the County Court.

6. Trustees under a will are chargeable with rents of real estate actually received, or which might have been realized by the exercise of reasonable care and diligence. The fact that farms rented on shares do not, in a given year, pay as much as if rented for cash, is not sufficient to charge the trustees. In the case presented, this court holds, in view of the facts, that the trustees were not guilty of bad faith, or a lack of reasonable care and diligence in managing the farms in question or other real estate named, and that there is no evidence justifying the charging to them any more than they accounted for.

7. In the ordinary course of business it is not necessary that every trustee shall be present and participate in every act.

8. Trustees are not to be judged by a standard of perfection which would insure the best results. It is sufficient if they exercise reasonable care and prudence.

9. A stockholder in a bank has no legal title to the profits of the business until a division is made. Profits in the control of the directors are income to the corporation and belong to it, but they are not income to the stockholders until such division.

10. Where a dividend upon its stock is declared by a corporation, it belongs to the person holding the stock at the time of the declaration, whether the holder be a life tenant or remainderman, without regard to the source from which, or the time during which, profits and earnings divided were acquired by the company.

11. Where dividends or profits are in question, such dividends and profits are meant as are ascertained and declared by the corporation, and not profits growing day by day, or month by month, to be ascertained by investigation into the accounts and transactions of the corporation by third persons, or by the court.

12.   While dividends in cash, bonds, certificates of indebtedness and the like are income, stock dividends made as such by the act of a corporation within its powers are generally held to be accretions of capital and go to the remainderman.

13.   In the case presented, this court holds, as regards the conduct and management of the estate involved, that the trustees herein so performed their duties, that their removal would be unjustifiable, and that it can not be assumed that any ordinary business men under like circumstances would do any better if substituted in their places.

14.   This court also holds that the *cestuis que trust* were entitled to the net income arising out of funds in the executor's hands, computable from the testator's death, upon the estate as it existed at the death, as afterward ascertained upon settlement of the estate.

15.   In the case presented, it is held that the profits of certain bank shares were income, in the absence of an affirmative binding act on the part of the bank changing their character, and that it was immaterial whether they were earned by the bank in the lifetime of the testator or after.


[Opinion filed December 7, 1891.]


APPEAL from the Circuit Court of Lee County; the Hon. JOHN D. CRABTREE, Judge, presiding.

Mr. WILLIAM R. PLUM, for appellants.

It is a breach of trust not to furnish accurate information of estate; trustees must keep clear and distinct accounts, and be ready to render them whenever called for, or pay costs. Willis on Ests. of Trustees, L. L. No. 10, 177–81.

It is a paramount duty to have them ready and open for inspection.   Courts will not tolerate an omission.   Urlin on Trusts, 277.

Trustees are bound to keep clear and distinct accounts of the property in their management.   Freeman v. Fairlie, 3 Mer. 43.

All presumptions are against trustees failing to keep accounts.   Perry on Trusts, Sec. 821.

Payments to attorneys and others for work on accounts which the trustees themselves may do, will not be allowed. Hurlbut et al., Ex'rs, v. Hutton, 13 Cent. Rep. 378 (N. J.); Fowler v. Lockwood, 3 Redf. R. 466.

Executors must promptly collect, especially where out on

personal liability only, though debtor is reputed wealthy.
Solicitation without suit insufficient. Lawson v. Copeland, 2
B. C. C. 156; Carey v. Bond, 6 Beav. 486; Bailey v. Gould,
4 Y. & C. 221; Att'y Gen'l v. Higham, 2 Y. & C. C. C. 634;
Powell v. Evans, 5 Ves. 839; Bullock v. Wheatley, 1 Call,
130; Lewin on Trusts, 290; Schouler on Executors, 267;
Johnson's Estate, 9 Watts & S. 107; Byrne v. Norcott, 13
Beav. 336; Whitney v. Peddicord, 63 Ill. 249; Johnson's
Est., 9 Watts & S. 107.

They should not have employed the bank's attorney. Waring
v. Waring, 3 Ir. Ch. R. 331.

Alden had no right to secure his own debt at the expense of
the estate. Long's Estate, 6 Watts' Rep. 49.

Trustees are held to the same diligence they should exercise
as to their own affairs. Lewin on Trusts, 294–297; Perry on
Trusts, 266.

Alden and Robinson are liable in chancery for a *devastavit.*
Rowan v. Kirkpatrick, 14 Ill. 1; James v. Frearson, 1 Y. &
C. C. C. 370; Taylor v. Millington, 4 Jur. N. S. 204.

They can not plead the dual capacity dodge in these courts
of conscience and common sense. Johnson v. Johnson, 2 Hill,
(So. Car.) 215; State v. Hearst, 12 Mo. 365; Watkins v. State,
2 Gill & J. 220; Karr v. Karr, 6 Dana, 3; Williams on Ex-
ecutors, 1658, 6th Eng. Ed.

Manifestly the executorship and trusteeship were so related
that breaches of trust in either capacity by parties holding
both positions, which endangered the fund they were to re-
ceive in the other capacity, was inquirable in a bill for removal
grounded on a breach of trust, and equity having jurisdiction
for one object will retain it for all purposes of complete
relief.

The rule that trustees can make no profit out of their trust
estate requires no citations.

If they profit by deposits they must at least repay those
profits. Brown's Estate, 11 Phila. 127; Whitney v. Peddi-
cord, 63 Ill. 249.

Use can not be disguised by loans to his firm. Schouler's
Ex'rs, 464.

Investment in interest-bearing securities is one of the most important duties. Perry on Trusts, 452.

And unless performed in a reasonable time, the trustees are chargeable with interest. Perry on Trusts, 462, and N.; Fowler v. Colt, 25 N. J. Eq. 202 ; Gilman v. Gilman, 2 Lans. 1; McIntyre v. People, 103 Ill. 142; Lewin on Trusts, 293 ; Knowlton v. Bradley, 17 N. H. 458; Clemens v. Caldwell, 7 B. Mon. 171.

The burden is cast upon the trustees to excuse their neglect. Knowlton v. Bradley, 17 N. H. 458.

Each trustee must see for himself that investments are made. Lewin on Trusts, 265.

Executors must separate legacies for investment. Fowler v. Colt, 25 N. J. Eq. 202.

Failure to invest is a good ground for removal of a trustee. Clemens v. Caldwell, 7 B. Mon. 171; Att'y Gen'l v. Garrison, 101 Mass. 223.

Robinson's absence and inaction: "The *cestuis que trust* are entitled to the absolute certainty of personal devotion to their interests," and absent trustees will be removed. Farmers' Loan and Trust Co. v. Hughes, 11 Hun, 130; Lill v. Neafie, 31 Ill. 101.

"The appointment of new trustees is an ordinary remedy, enforced by courts of equity in all cases where there is a failure of suitable trustees to perform the trust, either from accident, or from the refusal of the old trustees to act, or from their original and supervenient incapacity to act, or from any other cause." Story's Eq. Jur. 1287, and citations.

If their acts or omissions endanger the trust property, or show a want of honesty or proper capacity, or reasonable fidelity, they will be removed, and in cases of positive misconduct, courts of equity have no difficulty in interposing to remove trustees. Story's Eq. Jur. 1289.

In the (unwitnessed) attempted codicil the testator, under his own signature, attempted Robinson's removal.

Courts will have regard to the wishes of the person by whom the trust has been created, if expressed in, or clearly to be collected from the instrument creating the trust. In re Temple, 12 Jur. N. S. 539.

Courts will not appoint one if testator has expressed disapprobation of him.  Perry on Trusts, 277.

Any reason for a suit on the bond would be cause for removal.  Andrews v. Tucker, 7 Pick. 250.

They may be removed for loaning on personalty, though some of the *cestuis que trust* approved of it.  Johnson's Appeal, 9 Pa. St. 416.

If it can be shown trustees have been guilty of misconduct, waste or an improper disposition of the estate, or undue leaning toward conflicting interests, or that the trustees are out of the jurisdiction, the court will appoint new trustees as soon as possible.  Perry on Trusts, 818.

If fund is mismanaged, removal follows.  Richards v. Barrett, 5 Ill. App. 510.

It is no answer as to neglect to keep accounts to say they have been put into shape by a new set of books.  Contrition does not toll non-performance.  Castle v. Castle, 1 DeG. & J. 352; Crump v. Williams, 56 Ga. 590; In matter of Durfee, 4 R. I. 401.

Appellants have a right, as a matter of law under the proofs, to the removal of the trustees; if it be said to be discretionary with the courts, it would be an abuse of it not to remove; hence, it is not discretionary.

The Circuit Court erred in allowing Alden and Robinson costs and expenses of this litigation including solicitor's fees and expenses, and in not taxing all costs against them personally.

Costs: If a tithe of the complaints have been established, the order settling costs and fees is without merit.

Trustees must be constantly ready with their accounts, and not mix them with others.  If suit is necessary they will be mulcted in costs.  Urlin on Trusts, 277; Fletcher on Estates of Trustees, L. L., No. 10, 177; Godefroi on Trusts and Trustees, 227–8; Tiffany & Bullard on Trusts and Trustees, 704–5–6; Perry on Trusts, 911.

Chargeable if credits omitted in accounts.  Chamberlain v. Estey, 55 Vt. 378.

If he denies assets contrary to the facts, suppresses evi-

dence, puts plaintiffs to unnecessary proof, sets up unfounded or inequitable defenses, he must pay the costs. Perry on Trusts, 900; Cook v. Lowry, 95 N. Y. 103.

Chargeable if only inconvenience results from misconduct, not wilful. Perry on Trusts, 901, 903.

So if guilty of breach of trust in general. Tiffany & Bullard, 703; Moore v. Zabriskie, 3 C. E. Greene, 51.

Or loan money in a manner unauthorized. Ibid. 704.

If suit concerns separate funds they bear their share. Perry on Trusts, 903 A.

If trustee fails in his resistance to claims he is liable for costs. Beverly v. Brooke, 4 Grat. 187; Jenkins v. Eldredge, 3 Story R. 325.

Solicitor's fees: If a trustee is deprived of his costs for misconduct he can not have solicitor's fees. Perry on Trusts, 910.

He has no claim for reimbursement, if proceedings were occasioned by his negligence. Lewin on Trusts, 636-7.

In so far as this bill sought to charge Alden and Robinson personally, even if the defense is successful, they can not have solicitor's fees, for where its object is to create a trust fund, as in the Marsh and Harvester matters, and " to convert defendants into trustees under a constructive trust, * * * the defendants can have costs only as between party and party, if the plaintiffs fail; for the suit in such case turns out to be between strangers." Perry on Trusts, 896.

Only one set of costs are taxable, hence, if two trustees appear by separate solicitors, the fees of one set only will be taxed. Daniell's Chy. Pr., 1413, 4th Am. Ed.

This rule can not be avoided by the two uniting in employing seven solicitors.

Nearly $4,000 were used pending suit without leave of court, and before the court had, in part only, exculpated the trustees.

Where the trustees are entitled to commissions they can only deduct it after an allowance by the court. Danly v. Cummins, 31 N. J. Eq. 208.

This fund was withdrawn from the principal income fund all these years of litigation.

Messrs. William Lathrop and Carnes & Dunton, for appellees.

"Where the will appoints a person executor and then imposes upon him as such the execution of a trust, then the appointee, by proving the will and qualifying as executor, will be deemed to have accepted the trust, and he is accountable in each capacity separately. It is as if two different persons had been appointed to the two offices. But there is nothing to prevent a person who is named both executor and trustee from accepting one office and renouncing or disclaiming the other, or, having accepted both offices, he may be removed from one office for cause and retained in the other."

In Hill on Trustees, third American edition, side page 237, we find the following:

"It has been already seen that where the same person is appointed executor of a will as well as trustee, the probate of the will by him will be an acceptance of the trust. *It is frequently difficult to ascertain the precise time when the possession in the character of executor or administrator ceases* and that in the character of trustee commences. Every case must depend upon its own circumstances. * * * Page 238. This question can only arise respecting personal estate, for when real estate is given to persons in trust by a will and the same persons are also appointed executors, they will take the land as devisees from the first, although the trust is to sell, and will have nothing to do with the real estate as executors."

The question arises, what are the net income and profits that these trustees are ordered to pay over?

First. When shall these trustees begin the computation of the net income and profits? The leading English case on that subject is Stilwell v. Barnard, 6 Ves. 520, cited in Pomeroy's Equity Jurisprudence, Vol. 3, p. 136, where is found a discussion of the question of income and profits, under the head of "Conversions." The same case is cited in Perry on Trusts, 2d Vol., Sec. 550-1, where the same question is discussed under the general head of "First Year's Income."

In the leading case of Stilwell v. Barnard, 6 Ves. 520, the

holding was that the life tenant was not entitled to any of the
first year's income, but that such income should accumulate
for the benefit of the remainderman.    Later the English
courts seem to have abandoned this doctrine, and the cases of
Dimes v. Scott, 4 Rus. 209, Taylor v. Clark, 1 Har. 161, and
Hill on Trustees, pages 388, 389, may be consulted, showing
the tendency to break away from that holding.    Mr. Hill in
his work on Trustees, page 388, says:

"The interest which the tenant for life will take during
the first year after the testator's death is yet an unsettled
question.    This question admits of four possible solutions,
and the decisions of very eminent judges may be urged in
support of each.

"First.    The tenant for life may be entitled to nothing until
the expiration of a twelvemonth from the testator's death
according to the opinion of Sir John Leach in Scott v. Hol-
lingsworth, and of Sir Thomas Plummer in Taylor v. Hibbert,
and the income in the meantime is to be added to and form
part of the capital of the residue.    Both of those learned
judges appear to have assumed that this opinion was in accord-
ance with the established rule of the court, and Sir Thomas
Plummer treats this general rule as having been so settled by
Lord Eldon in the case of Stilwell v. Barnard.    However,
in the subsequent case of Angerstein v. Martin, that great
judge himself disclaimed any intention of establishing any
such general rule by his decision in Stilwell v. Barnard, a
decision which he stated to have been founded on the direc-
tion to accumulate, which formed an ingredient in that case;
and his lordship's further observations on the decisions in
Stilwell v. Barnard and Scott v. Hollingsworth have mate-
rially weakened the authority of those cases, if indeed they do
not expressly overrule them.    The case of Viegers v. Scott
arose upon real estate, which was directed to be sold, and
the point in question does not seem to be argued in that case.

"Second.    According to the decision of Sir A. Hart, V. C.,
in La Terriere v. Bulmer, the *cestui que trust* for life dur-
ing the first year after the testator's death will take the
income of such parts of the estate as are properly invested
at the testator's death, or may become so invested during that

year. Lord Eldon's decisions in Gibson v. Bott and Hewitt v. Morris, are also in favor of this doctrine, which is also strongly supported by the observation of Sir J. Wigram, V. C., in Taylor v. Clark.

"Third. The tenant for life may be entitled to the income arising from the property in its existing state during the first year from the testator's death. And this view of the law is supported by Lord Eldon's decision in the case of Angerstein v. Martin, and by that of Lord Langdale, M. R., in Douglas v. Congreve. It has been observed by Vice-Chancellor Wigram, that it might be a question whether Lord Eldon's decree in Angerstein v. Martin was intended to impeach the law as laid down in La Terriere v. Bulmer, and even if such were Lord Eldon's intention, it must have been considered as overruled by Lord Lyndhurst's decision in Dimes v. Scott. The later case of Douglas v. Congreve, which is clearly inconsistent with Dimes v. Scott, was also strongly questioned by Vice-Chancellor Wigram in the recent case of Taylor v. Clark, in which all the authorities on this subject are collected and reviewed, and his Honor's decision in which he followed Dimes v. Scott in preference to Douglas v. Congreve, is directly at variance with the latter case.

"Fourth. According to the determination of Lord Lyndhurst in Dimes v. Scott, the tenant for life will take, not the interest actually arising from the property during the first year after the testator's death, but the amount of the dividends on so much three per cent stock as would have been produced by the conversion of the property at the end of that year. And this solution of the question has recently been adopted by Vice-Chancellor Wigram in the case of Taylor v. Clark.

"In this conflicting state of authorities on the subject, nothing but the decisions of the highest judicial authority can set the question completely at rest. But in the meantime, it is conceived that the fourth alternative, as established by the present Lord-Chancellor, in Dimes v. Scott, and adopted in Taylor v. Clark, the latest case on the subject, must be considered as carrying with it the greatest authority in its favor.

However, should any adverse claim be originated on this point, no trustee could be advised to take upon himself the responsibility of putting his own construction on the relative rights of the tenant for life and remainderman, which could only be determined with perfect safety to all parties by the decision of the court."

The court erred in finding that the twenty shares of stock in the Commercial National Bank issued to the trustees, belonged to the income fund; he should have found same to be a part of the principal fund.

Upon this question there is some conflict of the authorities, but we believe that the finding of the court is against the weight of the authorities, and inasmuch as this case seems likely to settle the law in this State on the subject we give considerable attention to it.

The authorities cited show three solutions of the questions here presented.

First. That such stock dividend be treated as principal without reference to when it accrued.

Second. That it be treated as income without reference to when it accrued.

Third. That it be treated as principal or income or apportioned according to when it accrued.

Under the first or third line of authorities indicated, the foregoing statement of facts clearly indicates that these stock dividends in this case should be treated as principal. It is only by following the second line of authorities that the conclusion reached by the master and court can be sustained.

The latest decision that we find upon the subject is that of Greene et al. v. Smith et al. (R. I.), 19 At. Rep. 1081. The court there says: " The effect of issuing the new shares is simply to distribute the surplus value previously belonging to the old, proportionately lessening the value of the old. Such a readjustment can not be said to result in income. It is not income, but capital in a changed form." Citing Biddle's Appeal, 99 Pa. State, 278–283; "and this is the doctrine which is, at least in cases like this, the more generally supported by

the decisions of the courts in England and the other States."
Citing Atkins v. Algree, 12 Allen, 359; Biddle's Appeal, 99
Pa. St. 278; Brinnell v. Grow, 50 Conn. 66; In re Kerno-
chan, 104 N. Y. 618; 11 N. E. Rep. 149; In re Barton's
Trusts, 17 Law T. (N. S.) 594; Sanders v. Bromley, 55 Law
T. (N. S.) 145; Cook, Stocks, 559.

Mr. Cook in his work on Stocks, etc., Sec. 559, above cited,
announces the rule contended for by us, and cites many
authorities in its support, without indicating that there is any
conflict in the holdings of courts on the question.

Mr. Perry in his work on Trusts, Sec. 545, discusses the
question fully in the light of decisions of that time. The
court will desire, no doubt, to examine the text and notes of
those authors on the subject, and we therefore do not quote
from them.

It seems to us after reading them that they fully sus-
tain our quotations from Greene v. Smith first cited above;
that the rule there announced is the one generally supported.

Shares of capital stock in corporations representing surplus
property, and distributed to its stockholders, are not to be
considered income and belonging to life tenant. In re Brown,
14 R. I. 371; Minot v. Pain, 99 Mass. 101; Leland v. Hayden,
102 Mass. 542; Heard v. Eldredge, 109 Mass. 258; Gifford v.
Thompson, 115 Mass. 478; Parker v. Mason, 8 R. I. 427.

So much of the surplus as was earned before death of
the testator is principal, and so much as is earned after death
belongs to the life tenant. Earp's Appeal, 28 Penn. St. 368.

"Extra dividends belong to the remainderman if they are
carried to the account of the accumulated profits or surplus
earnings at the death of the testator." Van Doren and wife
v. Olden, Trustee, 19 N. J. Eq. 176.

CARTWRIGHT, J. James S. Waterman died July 19, 1883,
leaving a will which was afterward admitted to probate in the
County Court of DeKalb County, whereby he gave one-third
of his estate to his widow, and after making a bequest of
$5,000 to another person, gave the residue of his estate to the
appellees, Philander M. Alden and George S. Robinson, in

trust for his brothers and sisters for a term of twenty-one years after his decease, during which time the trustees were directed to hold and manage the trust estate and pay over to such brothers and sisters the net income and profits in equal proportions annually, the child or children of a deceased brother or sister to take the same share the parent would if living, and at the expiration of the trust, the property embraced in it was to be divided equally among the same persons named as beneficiaries in the trust. A partition of the estate with the widow was to be had, and power was given to sell and dispose of property at public or private sale at such time or times, and on such terms and in such manner as might be deemed best, and the proceeds to be invested subject to the regulations of the trust. The executors were directed not to oppress debtors unnecessarily, but to extend indebtedness amply secured as they might deem best, and to give time of payment of other claims in their discretion, provided they could do so without prejudice to the estate. The appellees were also appointed executors of the will. By a subsequent unwitnessed, and therefore invalid clause, the testator sought to revoke the appointment of George S. Robinson as executor, and appoint Robert W. Waterman, one of the appellants, in his stead. Appellees qualified in the County Court as executors, and accepted the trust created by the will. The widow renounced the provisions of the will in her behalf, and took one-half of the estate in pursuance of the statute, there being no descendants of the testator. The executors filed their inventory of the property of the estate, amounting to $531,428.34, of which the estimated value of the real estate was $127,512.70. The County Court having acquired jurisdiction of the administration of the estate in the executors' hands, proceeded with it substantially in the usual manner. The executors presented to that court their reports, and various proceedings were had relating to their accounts and the settlement of the estate in their hands as executors. The estate being still unsettled in the County Court, the original bill in this case was filed June 9, 1887, by certain of the appellants interested in the trust created by the will, and

against the appellees, Alden and Robinson, and others who were beneficiaries under the trust. Some of the latter afterward became co-complainants in the bill on their petition, and the bill was amended from time to time, but the widow was never made a party. Issues being made, the cause was referred by agreement to a special master who made report, and the venue afterward being changed from the Circuit Court of DeKalb County to Lee County, it was there referred to the master in chancery, who took testimony and stated an account, and reported to the court, and a final decree was entered from which this appeal was taken. The bill as amended, made numerous charges of neglect and misconduct against Alden and Robinson, both in their capacity of executors and also as trustees. The charges against them as executors were, that Robinson was absent in Vermont on business most of the time and neglected his duties; that they kept large sums of money on hand which should have been distributed; that Alden was cashier, director and stockholder of the Sycamore Bank, where large sums were deposited without interest, whereby he profited; that claims of the estate against a harvester company and C. W. and W. W. Marsh were almost wholly lost by neglect, and through Alden pressing a claim of the Sycamore Bank in which he was personally interested against the same debtors and obtaining priority; that they made no effort to sell harvester and binder company stock, whereby they were lost; that Alden charged the estate railroad fares while riding on a pass; that suits were delayed and claims not pressed, and that they failed to keep proper accounts, and in general neglected their duties as executors. The charges affecting Alden and Robinson as trustees were, that Robinson was absent and neglected his duties; that they retained moneys that should have been distributed and kept a deposit in the Sycamore Bank; that they kept large sums of the principal fund uninvested; that they had made a loan on personal security and a loan out of the State; that Alden charged fares while riding on a pass, and charged insurance commissions on trust estate; that they sold rent-producing property and paid unreasonable commissions on sales and rents; that

they distributed income unequally and irregularly; that they
unlawfully bought and kept cattle, and fed and cared for exec-
utors' live stock on farms; that they sold lands and lots with
no investment in view; that they charged the income with
sums chargeable to principal, and collected income which they
claimed to be principal, and that they did not keep proper
accounts or report to the beneficiaries, and neglected and mis-
managed the estate generally. Complainants prayed for a
general accounting; that Alden and Robinson should be
decreed to pay what should appear to be due and should be
removed as trustees, and that other trustees should be ap-
pointed in their stead. In the original bill it was stated that
the trustees were not sued in their capacity as executors, but
in the amended bill this clause was omitted. Testimony was
taken, upon which it was sought to charge Alden and Robin-
son in this case in the accounting, with the losses to the estate
in their hands as executors on account of their alleged neglect
as executors to collect the harvester company' and Marsh
indebtedness, and to sell the harvester and binder stock, and
enabling and aiding the bank to obtain priority, and also with
interest on moneys kept on hand or deposited as executors
and belonging to the administration, and with railroad fares
charged by Alden, and with other matters connected with the
administration of the estate in the County Court. In the
final decree, the Circuit Court refused to make these charges
in the account on the ground that it had no jurisdiction to
investigate such matters for that purpose, and this is assigned
as error. The charges of dereliction in the capacity of exec-
utors, so far as they affected integrity or ability, were properly
enough included in the bill, and were proper subjects of in-
vestigation on the question of honesty and business capacity
as trustees. If the evidence showed Alden and Robinson to
be dishonest or incapable, it would be material as furnishing
ground for removal. One-half of the estate remaining after
the payment of debts, which they were managing as executors,
was in the end to come into the trust estate in their hands as
trustees, and while they acted in dual capacities, and in law
were distinguished as separate persons in their separate capac-

ities, yet as trustees it was their duty to collect and receive what might become due to them as such, without loss or diminution by their neglect, and to that end they should keep a watchful eye upon the sources of the fund. The source of the fund in question was in the administration of the estate. The personal estate vested in the executors, and the trustees could only take through the executors in the distribution of the estate in the County Court. The trustees had no title to the claims or stocks, and could neither collect the one nor sell the other. It was the duty of the executors to collect the claims and convert the property into money, and render a just and true account to the County Court as required by law.

The County Court had full power and jurisdiction to call them to account, and to charge them with all losses occurring through their neglect or misconduct. Upon final settlement, parties interested are entitled to notice and have a right of appeal, and in case there is no appeal, the adjudication is binding on all and settles the relative rights of the parties. While the conduct of these parties as executors as well as trustees might be a proper subject of inquiry in determining the question of removal, yet the County Court had jurisdiction of their accounts as executors, and that jurisdiction was exclusive, unless in a proper case it should be superseded by the Circuit Court under the general chancery jurisdiction. It may be so superseded, but it can only be done where the court has jurisdiction of all parties in interest, and for special reasons, showing that the administration should be withdrawn from the County Court, and then only by taking cognizance of the whole administration. Freeland v. Dazey, 25 Ill. 294; Heustis v. Johnson, 84 Ill. 61; Crain v. Kennedy, 85 Ill. 340. In this case it was neither asked nor intended that the Circuit Court should assume jurisdiction of the whole administration of the estate; no reason was alleged, or proven, for withdrawing the administration from the County Court, and the widow, who was entitled to one-half the estate, was not made a party. The Circuit Court did not have the necessary parties before it to enable it to adjudicate upon the particular portions of the administration sought to be drawn

in question. The widow was equally interested with the complainants in the subject-matter of these charges, and was a necessary party even in case the court should assume jurisdiction of a part of the administration. In any view of the case the court had no right to investigate these charges for the purpose of bringing the parties to account and the action of the court in that regard was correct. So far as the evidence of matters occurring in the administration is material to the question of removal of the trustees, it will be considered in connection with all the other evidence upon that subject. It is urged that if the court could not charge Alden and Robinson with the claims arising in the administration in their capacity of executors, then in order to accomplish the same thing by indirection it should apply the maxim that equity will treat that as done which ought to have been done, and will say that as executors, they collected these obligations because they ought to have done so, and then distributed the proceeds because they ought to have done so, and in the distribution they received as trustees one-half of the sums so treated as collected, and therefore such part is to be charged to them in their accounts. The maxim only operates in favor of one who holds an equitable right to have the thing done as against the one upon whom the duty of doing the thing has devolved, and only treats that as done which ought to be done. The duty of doing the collecting and distributing devolved upon the executors, and the jurisdiction to determine whether the acts claimed ought to have been done was in the County Court. What the court is asked to treat as done, was to be done by the executors, and involves the same questions of jurisdiction and parties as if the same charges were made in some other way.

Appellants filed eighty-six exceptions to the report of the special master, and seventeen exceptions to the report of the Lee County master, in which exceptions the administration matters are mingled with the affairs of the trust; but the claims made in respect to the latter, may be considered under a few heads. The master and court charged the trustees with $43.20, the amount of railroad fare charged by Alden as

trustee while riding on a pass, and also with $14.60 insurance commissions received by him as insurance agent for effecting insurance on trust estate. The remaining claim concerning railroad fares, concerned the administration and not the trust.

The testator owned three farms at the time of his death, and they were all rented on shares, two of the leases extending two seasons after his death. Partition of the real estate was had with the widow, and the farms allotted to the trustees were afterward sold. In the meantime they managed the farms, and the claims of appellants connected with them are, that they bought and fed cattle, and fed executors' stock on the farms without keeping account of produce fed to such stock of executors, or collecting pay therefor; that the receipts of rent were grossly inadequate, and for that reason and want of proper accounts, the trustees should be charged with the keeping of the stock or the rental value of the farms, and that the farms were sold to irresponsible purchasers with insufficient security. The testator rented the farms with stock for dairy business, and for growth and increase, and the income and profits were to be shared. The stock was kept on the farms as agreed by the testator, and when sold, the proceeds were carried to the executors' account, as the stock was personal property. The grass which the stock ate in the pasture and the produce fed to cattle and hogs belonged to the trustees, but by the testator's contract it was, so far as necessary, to go into the stock, and that part of the income of the farms was to be in the form of an interest in the stock to be turned into money. The trustees could not alter that arrangement. If they could charge the executors with the keeping of the stock and change the income of the real estate which he had fixed in profits and increase of stock, into direct cash income, it would be ruinous to the executors in case there should not be the anticipated profit. In this condition of affairs there was no account kept of what was eaten by the stock. If it was proper it could not be done so as to afford any aid in determining relative rights. If the account had been kept it would throw but little, if any, light upon such questions as how much of the value of milk should be

credited to the cow and how much to feed, and when milk was fed to pigs, how much of the value of a pig should be credited to parents, how much to the cow, how much to the cow's food and how much to other food eaten by the pig.

It is manifest that the proportion of increase and profit each should receive must be estimated on some fair basis. The proceeds of the stock all went into the executors' account, and in order to adjust the relative rights, the master made a division of increase and profits on a basis of five per cent interest to the executors on the appraised value of the stock, and allowing the trustees the balance, which was as fair as any rule that could be made. After the testator's leases expired, the trustees rented the farms until sold. In the renting of the farms they were chargeable with the rents actually received, or which might have been realized by the exercise of reasonable care and diligence. The income from farms they rented on shares was small, and less than the cash rental value, but the mere fact that a cash rent would have yielded more income is not sufficient to charge the trustees. The receipts of farms rented on shares vary with crops and prices. The testator had rented the farm on shares, and the evidence shows that during these years farming in general was unprofitable.

So far as appears, the trustees received their shares and accounted for all they received, although they had no special method of keeping accounts, and in the stock business got trustees' accounts mixed with executors'. In January, 1884, a lot of steers were sold from a farm and more bought to replace them at a cost of $660, which was put in the trustees' report, and it being ascertained that this was wrong, they were transferred to the executors' to correct the error. They were fed on the farm and were bought and kept there under the lease. In view of all the facts, we think the trustees were not guilty of bad faith, or a lack of reasonable care and diligence in managing the farms. The farms were sold, and apparently good security taken, and there seems to be no special reason for apprehending a loss. At any rate, there has been no loss as yet to be charged to the trustees.

The testator left improved and unimproved real estate in

Chicago, and a portion of each was allotted to the trustees in the partition. They were charged in the bill in this case with having expended large sums for repairs, and selling the property when productive with no investment in view, with paying unreasonable commissions on rents and sales and with not selling unimproved, non-productive property, and it was sought to recover from them the alleged unnecessary expenses, losses and excessive commissions. The properties were out of repair and the moneys expended for repairs were so expended to put them in good condition, and in that way the permanent vendible value of the properties was enhanced. The income tenants were only bound to bear the expense of keeping them in ordinary tenantable condition, and the parties agreed that if the repairs were reasonable, a certain amount should be charged to the permanent fund, and this was done. The real estate was left in the care of the same agents who had been employed by the testator, and we see nothing from which to conclude that their charges were unreasonable, or that expenses were improperly incurred. The parties having agreed upon $4,354.65 to be charged to the permanent fund as its share of the expenses of improvement and management the matter was properly adjusted on that basis. The trustees were bound under the law and by the will to exercise discretion as to the time of selling, and it would be unreasonable to hold that if a customer should be found at a good price, a sale should not be made, because the investment was not then provided, or that they should sell vacant lots at all events, and could not hold them for a reasonable time with a prospect of a rise in values in a rapidly growing city in the near future. Unproductive property should be converted so that the income tenants may receive income, and if held for a time, the equities of such tenants and the remaindermen should be and may be adjusted in the proceeds, and there may be cases where trustees would be liable, but there is no present reason shown for charging these trustees on account of the delay. It is claimed that the trustees should be charged with interest on moneys in their hands belonging to income and not distributed, and upon a deposit in the Sycamore Bank, and for

the purpose of equalizing unequal distribution of income. There was no large amount of income kept on hand, and the trustees' deposit in the bank was small and no more than was reasonable. Distributions of income were not made equally among *cestuis que trust*, but seem to have been regulated largely by needs and importunities, and they were made equal by the court by charges and credits of interest ranging from twelve cents to $61.65, and this appears to be correct. It is also contended that the trustees should pay interest on permanent fund not invested. The record shows that the trustees were making frequent loans out of the fund on the security of farm mortgages at six per cent or more, and kept the remainder of the fund drawn upon for these loans in the Commercial Bank and Illinois Trust and Savings Bank at such rates of interest as could be obtained from banks. Having a large fund to loan, they would necessarily have considerable sums on hand from time to time, which could not be at once invested in farm mortgages, and they realized what they could on such sums and accounted for the interest, which was more than could have been realized in government securities. There was no ground for charging them any more than they accounted for.

All questions raised by appellants relative to liabilities of the trustees in matters of account have been noticed and the question of removal remains to be considered. Upon this question all the evidence, including that concerning management, which has been already considered and need not be again adverted to, is to be taken into account. Robinson was a lawyer, and had been a county judge, and he drafted the will in question. Alden had been in the employ of the testator for many years, assisted him in his business, and was familiar with his property, and for these reasons was especially qualified to take the active management of affairs as executor and trustee. At the time of testator's death, Robinson was absent in Vermont and remained there some time attending to his brother's estate. When he first returned to Sycamore he qualified as executor, and this was agreeable to the parties who manifested any desire in the matter, although it was

known that he would be absent from home much of the time for a considerable period. Alden took the active management of the administration, but Robinson gave it such attention as he was able. If Robinson's absence affected anything injuriously, it was the early administration of the estate. We can not find that anything pertaining merely to the trust was neglected on that account. About a year after testator's death there was an unsuccessful attempt to remove Robinson from the executorship in the County Court. In the ordinary course of business it is not necessary that every trustee shall be present and participate in every act. Afterward when the estate in the trustees' hands was being increased from the administration, he was able to give all necessary time to his duties as trustee, which, from his profession, would naturally be expected to be largely of an advisory nature. Alden, as executor, charged the estate for railroad fares when riding on a pass obtained partly, at least, on account of his position as executor, but there was no deception about the charges, and the matter was passed upon by the County Court. With regard to the claims of losses to the estate in the administration through failure of the executors to collect claims, or sell stocks, and other matters connected with the administration in the County Court, the question of liability is not involved here, and if they should be found liable on those claims or any of them, it would afford no ground for removal as trustees.

The evidence concerning those matters does not show anything affecting their character for honesty which would render them generally unfit to be trustees, nor as trustees have they failed in any duty in seeing that the executors were charged with the whole personal estate. The executors inventoried all the property, real and personal, and in reporting their account to the court, charged themselves with the entire personal estate, amounting to $414,824.93, and in order to balance this charge against them, must show it all out of their hands to the satisfaction of the County Court. By this system of accounting, they were charged in that court with everything, whether good, doubtful or desperate, and were required to establish credits, and the balances were carried along from one

report to another. It is difficult to see how any greater charge could be made. The executors' and trustees' accounts were not kept in an orderly or systematic manner, and the two accounts were mixed in some instances. An illustration of the latter, and of the difficulties of classification, is to be found in the case of the stock on the farms hereinbefore mentioned. There was neither fraud nor intentional omission of duty and the accounts in some form or place embraced everything of which account should be kept. This necessitated a new set of books with accurate classification. The confusion was not strange in the mingled condition of executors' and trustees' estate. They were finally sorted out correctly with the aid of attorneys. The trustees made one loan on personal security, and one out of the State, but they were made innocently and no loss occurred in consequence. The estate was not only large but was confined to no line of business, and was dispersed over different States. The testator not only was connected with the running of farms and owned and rented real estate in Chicago, but was in banking enterprises and the harvester and binder company, owned cattle in Kansas and lands in Michigan, and had been in other business in Wisconsin and other foreign States.

The testator was involved in many transactions out of which litigation arose and many very large claims were prosecuted against the estate. It is not strange, considering the size and character and situation of the estate, that some things could be found in its management that would be open to just criticism, and such is the fact in this case; but the same thing would be true of an ordinary person managing an estate of his own of like character and extent. These men are not to be judged by a standard of perfection which would insure the best results. It is sufficient if they have exercised reasonable care and prudence. In what has been said we have noticed everything in their conduct and management of the estate which seems worthy of attention and find nothing to require or authorize their removal as trustees, or to lead us to believe that any ordinary business men under like circumstances would do any better if substituted in their places.

The court taxed two-thirds of the costs of suit to the principal fund and one-third to the income fund, and allowed the trustees three-fourths of their solicitors fees and expenses in this suit to be paid out of the principal fund, and required them to bear the remaining one-fourth of their solicitors fees and expenses. Both parties have assigned error upon this disposition of those charges. The costs of suit are ordinarily in the discretion of the court and we think they were properly taxed to the funds. The trustees should be allowed for all necessary expenditures, but a part of these expenses were for work on the books and other services rendered necessary by failure in the first instance to keep the accounts, and we can not say that the decree was wrong in that regard. Appellees have also assigned other cross-errors. The point is made but not urged, that the trustees were entitled to compensation for their services. The case of Cook v. Gilman, 133 Ill. 139, is conclusive that they are not, and this is practically conceded. There was no error in charging special assessments which enhanced the permanent value of the Chicago property to the permanent fund, requiring the income tenants to be charged ratably on account of increased income, the proportionate shares being agreed upon by the parties. The court held that the *cestuis que trust* were entitled to the net income arising out of funds in the executors' hands, computable from the testator's death upon the estate as it existed at the death, as afterward ascertained upon settlement of the estate. The rule adopted expressed the rights of the parties as we conceive them to be, where, as in this case, the income is given without limitation, and the rule is sustained by authority. Where there is no direction for accumulation in the executors' hands for the benefit of remaindermen, and nothing showing an intention to make the income computable from a later date, and the estate earns income, we see no reason why it should not be computed from the death.

The testator owned, at the time of his death, forty shares of Commercial National Bank Stock, of which twenty shares went to the widow, and the remaining twenty to the trust estate. The bank increased its capital stock to the amount of

$500,000 in new shares, and Alden and Robinson received twenty shares of the new stock paid for with accumulated earnings of the original stock in the possession of the bank. The Circuit Court held the new stock to be income, and to go to the *cestuis que trust*, and the correctness of this is questioned. The evidence on that subject is, that in March, 1885, the directors of the bank passed this resolution: "Whereas, by act of Congress, approved February 28, 1885, this bank was authorized to increase its capital stock to any sum not exceeding two million (2,000,000) dollars, therefore be it resolved, that under the authority granted by such act, the capital stock of this bank be at this time increased to the aggregate amount of $1,000,000, and that subscriptions for such increase of stock be immediately called for." A surplus equal to the amount of new stock had been earned at testator's death. The new stock was not issued as a stock dividend which stockholders were to take in that form, but these parties as original stockholders were permitted to subscribe for the new shares of stock to the amount of their interest in the accumulated earnings in lieu of a cash payment of that amount, so that they could take either stock or cash at their election. All the stockholders subscribed for new shares, so that there was no occasion for a cash dividend to be declared. The secretary testified that if any shareholder had refused, it would make no difference with the bank, as others stood ready with their money, and such shareholder would have received the money. If these parties had declined to subscribe for the new stock, they would have received at least $2,240, of which at least $240, was earned after the testator's death. There have been some fluctuations in the decisions upon questions of this sort. In the earlier English cases it was held that extraordinary dividends and bonuses belonged to the remainderman as accretions to the capital. The first case of that kind was Brander v. Brander, 4 Ves. 800, where it was held that government annuities received by a bank and distributed went to the remainderman. The rule was followed in Paris v. Paris, 10 Ves. 185, in case of an extra dividend, and the authority of Brander v. Brander was followed in other cases.

But in later cases the English courts refused to follow that rule, and cash dividends, whether ordinary or extraordinary, and bonuses declared out of profits, were held to belong to the income tenant. Barclay v. Wainright, 14 Ves. 66; Price v. Anderson, 15 Sim. 473; Johnson v. Johnson, 15 Jur. 714. And the latter rule is generally supported by the authorities in this country. Millen v. General Trustee, 67 Ga. 284; Richardson v. Richardson, 75 Maine, 570; Lord v. Brooks, 52 N. H. 72. If the action of the bank amounted to a distribution of accumulated profits, which by the action of the trustees in making the subscription for new stock was converted into such stock, then it would seem plain that the new stock was income, because the trustees could not change relative rights of the *cestuis que trust* and remaindermen by the act of subscribing. While dividends in cash, bonds, certificates of indebtedness or anything of that sort are income, stock dividends made as such by the act of the corporation within its powers are generally held to be accretions of capital and to go to the remainderman. Minot v. Paine, 99 Mass. 101; Biddle's Appeal, 99 Pa. St. 278. If a corporation has power to withhold dividends and use funds in such a way as to increase the *corpus* of its capital, and in pursuance of such power it withholds the dividend and gives its shareholders an increase of capital instead, then of course its action is binding on the individual stockholder, and the increase is an accretion to his capital. A stockholder has no legal title to the profits until a division is made. Profits in the control of the directors, are income to the corporation and belong to it, but they are not income to the stockholder until his share is ascertained and declared. Profits on hand are valuable to the capital and a right to share in them passes upon a sale or bequest, but they are the property of the corporation, and may be applied to such uses as it may lawfully make of them. While undivided profits belong to the corporation and affect the value of its stock, they are no part of the stock and do not increase the shares at all. An accretion to the stock must accumulate upon it in stock, and become corporate with it, and if the directors may lawfully use undivided profits in such

accretion, and do so while they remain the property of the bank, then the share of a stockholder never reaches him as income; but when it becomes his property by separation, it becomes his as capital by way of accretion to his shares. It is apparently upon the principle that the directors may, and do, in their discretion, give to the stockholders capital instead of income, that the court hold stock dividends to be capital. But profits are *prima facie* of the nature of income, and remain such, unless, under some discretionary power in the corporation, they are converted into capital. If any such discretion existed in the bank, it does not appear to have been exercised. If the earnings were turned into stock, then the stockholders must take it in that way. But the resolution did nothing but authorize subscriptions to the capital stock, and the bank was indifferent whether these parties should subscribe or not. When the property came to them as their own by separation from the corporate property it did not assume the absolute form of capital, but might be income, unless by their act it should assume the form of capital. Inasmuch as the bank did not attempt to exercise the power of conversion, it is not necessary to inquire whether the power existed. The profits were income in the absence of an affirmative, binding act on the part of the bank, changing their character, and it was immaterial whether they were earned by the bank in the lifetime of the testator or after his death. In some cases, the time when they accrued has been considered of importance, and there has been an apportionment, but they do not rest upon sound principle, and are opposed by the decided weight of authority. As we have said, the earnings of a bank do not belong to the stockholder, but are legally considered as accruing to him when they are separated and set off to him, and are therefore not apportionable. In Richardson, Ex'r, v. Richardson, 75 Me. 570, it is said : " And we would entirely reject the qualification of the rule admitted in some instances by some courts, that the life tenant is not entitled to so much of the dividend as was earned in the lifetime of the testator; too much difficulty and uncertainty would attend the practical operation of such a test; nor do we appreciate any legal or

Waterman v. Alden.

moral merit in it. We think the true rule to be that, when a dividend upon its stock is declared by a corporation, it belongs to the person holding the stock at the time of the declaration, whether the holder be a life tenant or remainderman, without regard to the source from which, or the time during which, profits and earnings divided were acquired by the company."

In Bates v. Mackinley, 31 Beav. 280, dividends earned before the testator's death, but declared afterward, were held to be income belonging to the tenant for life. When dividends or profits are in question, such dividends and profits are meant as are ascertained and declared by the corporation and not profits growing day by day, or month by month, to be ascertained by investigation into the accounts and transactions of the corporation by third persons, or by the court. Hyatt v. Allen, 56 N. Y. 553; Clapp v. Astor, 2d Ed., Ch. 379. It would be entirely impracticable for courts or trustees to apply a rule of apportionment by investigation of the accounts of a bank. A rule must be plain, uniform and capable of application by trustees in the performance of their duties, and it is immaterial that an apportionment could be made in this case. A rule of property is not to depend upon the possibility of its application in a particular case where a bank may choose to take an accounting at a particular date and make known the result.

No apportionment could be made without an examination of the accounts and transactions of the bank, and the courts refuse to enter upon such examinations, but regard dividends as accruing wholly at the time they are set apart.

The decree of the Circuit Court will be affirmed.

*Decree affirmed.*