## John DeKoven Alsop et al. v. Annie L. DeKoven and William Eliot Furness, Trustees, et al.

1. CORPORATIONS—*Undistributed Earnings Belong to the Corporation.*—The ownership of undistributed earnings is in the corporation and not in the holders of shares of its stock. A shareholder has no title to them prior to the dividend being declared.

2. SAME—*Extraordinary Cash Dividends Declared After Testator's Death go to the Life Tenant and Not to the Remaindermen.*— An extraordinary cash dividend declared after the death of the testator is income, like other dividends, and as such it is payable to the life tenant, under the provisions of a will giving her the net income of the stock.

3. SAME—*Stock Dividends go to the Remaindermen.*—Stock dividends belong to the *corpus* of the estate, and as such go to the remaindermen.

4. SAME—*Where Stock Dividends Are Lawful.*—A stock dividend is lawful when an amount of money or property equivalent in value to the full value of the stock distributed as a dividend has been accumulated and is permanently added to the capital stock of the corporation.

5. SAME—*Rights and Privileges to Subscribe for Additional Stock.*— Rights and privileges to subscribe for additional stock are incident to the ownership of the stock, and are capital to be added to the trust fund held for the remaindermen, the income of which goes to the life tenant. This is equally true, whether the trustee subscribes for the new stock for the benefit of the trust or sells the right to subscribe for a valuable consideration.

6. WORDS AND PHRASES—*Dividend Defined.*—A dividend is a corporate profit set aside, declared and ordered by the directors to be paid to the stockholders on demand or at a fixed time.

Bill to Construe a Will.—Appeal from the Circuit Court of Cook County; the Hon. FRANK BAKER, Judge presiding. Heard in the

Alsop v. DeKoven.

Branch Appellate Court at the October term, 1902. Reversed and remanded with directions. Opinion filed March 17, 1903.

**Statement.**—The facts upon which this litigation arises are substantially as follows: John DeKoven, who died April 30, 1898, left a last will and testament, by which he disposed of an estate amounting, it is said, to more than seven hundred and fifty thousand dollars. The will, after making sundry bequests, gives absolutely to the testator's wife the sum of $250,000, together with the household furniture of every description, the horses and carriages belonging to the testator, and as long as she remains unmarried, the use of the family homestead. The twelfth clause of the will, in respect to which the trustees seek the aid of the court, is as follows:

" Twelfth: I give, devise and bequeath all the rest and residue of my estate, real, personal and mixed, of every kind and nature whatsoever, including my homestead, subject to the use thereof hereinbefore given to my wife, unto my wife, Annie L. DeKoven, and my friend, William Eliot Furness, and their successors hereinafter provided for, in trust, to hold, invest, rent, manage and care for the same, and to pay the net income thereof, (less the one thousand ($1,000) dollars hereinbefore provided to be paid annually to my sister, Margaret DeKoven Casey,) unto my wife, Annie L. DeKoven, during her life, so long as she remains unmarried, and upon her death or remarriage, in trust to dispose of said estate as follows:" (Here follow sundry bequests.)

By clause five of the second codicil, the following disposition is made of the residuary estate :

" Fifth : I change sub-clause fifteen of clause twelve of my said will, so that the same shall read as follows: Fifteenth : To divide all the rest and residue of the said estate so by them held in trust, equally between John DeKoven Alsop, son of the late Joseph W. Alsop, and Louis DeKoven, son of my nephew, the late LeRoy DeKoven, share and share alike; and if either of them shall not be living at the date of the death or remarriage of my wife and shall have left children him surviving, his share shall be paid to such children; but if either of the said two legatees residuary shall have died without leaving children, his share shall be paid to the surviving legatee residuary."

The above named residuary legatees are the appellants in this case.

Letters testamentary were issued June 10, 1898, to complainants Annie L. DeKoven and William Eliot Furness as executors, who paid the debts and specific legacies, and were discharged as executors October 3, 1900. They accepted the trust confided to them and hold the balance of the estate as trustees under the will.

There is no dispute about the facts over which this controversy arises. They are stated in the master's report as follows:

"That among the assets belonging to the estate, were:

200 shares of the capital stock of the Chicago, Milwaukee and St. Paul Railroad Company, an Illinois corporation, of par value of $100 per share.

300 shares of the capital stock of the Pullman Palace Car Company, an Illinois corporation, of the par value of $100 each.

50 shares of the Pullman Loan & Savings Bank, an Illinois corporation, of the par value of $100 each.

355 shares of the Chicago Telephone Company, an Illinois corporation, of the par value of $100 each.

900 shares of the capital stock of the Chicago, Rock Island & Pacific Railway Company, of the par value of $100 each.

400 shares of the capital stock of the New York Central Railroad Company, a New York corporation, of the par value of $100 per share."

That on February 28, 1901, the Chicago, Milwaukee & St. Paul Railway Company directed an increase of ten per cent of its capital stock by an issue of common stock and directed that the new stock be sold to the stockholders at par, to furnish means for the following purposes:

"To replace funds expended for construction purposes from the income of the company to December 31, 1900, $4,522,520.25; and to provide funds for the construction of the Kansas City cut-off and other construction, $4,300,000."

The notice to stockholders recited among other things as follows:

"The right to subscribe will expire at three o'clock P. M.,

April 18, 1901, and stockholders who do not wish to sub-scribe, should sell their rights before that date."

That complainants, as trustees aforesaid, by reason of their holdings of said shares of capital stock, deemed it wise to sell their rights to subscribe to said new stock, and did sell the same, and received therefor, $887.50.

That at a meeting of the board of directors of the Pull-man Palace Car Company, held July 1, 1898, the following resolution was adopted:

"Resolved, that a quarterly dividend (No. 126) of $2 per share from the net earnings be declared payable on and after August 15th to stockholders of record at the close of business August 15, 1898.

Resolved, that a special dividend of $20 per share be declared payable on and after August 15th to stockholders of record at the close of business August 1, 1898.

Resolved, that the board of directors of this company are of opinion that surplus assets of this company to the extent of $18,000,000 existing at the close of the present fiscal year, should be distributed to the stockholders of the company, and that for such purpose the capital stock of this company should be increased to the sum of $54,000,000; and that the increase of stock should be issued to shareholders of the company in ratio of one share for each two held by them; and that the board of directors will recommend action accordingly to the stockholders of the company at the regular annual meeting to be held on the 13th of October, 1898.

Resolved, further, that the board of directors are of opin-ion that the regular dividends to be thereafter declared on the capital stock should be at the rate of six per cent per annum."

That complainants, as trustees aforesaid, have received said cash dividend of $20 per share on each share of stock of the Pullman Palace Car Company, aggregating $6,000.

That at the stockholders' annual meeting of the Pullman Palace Car Company held October 13, 1898, the following resolution was adopted:

"Whereas, the value of the assets of this company exceed the par value of the capital stock by more than $18,000,000,

Resolved, that for the purpose of representing in the cap-

italization of this company existing surplus assets to the extent of $18,000,000, the capital stock of the company is hereby increased fifty per cent, and the proper officers of the company are hereby directed to issue the said additional stock, being 180,000 shares, on the 15th day of November, 1898, and to distribute the same to stockholders of the company in the ratio of one share for each two shares held by stockholders of record on the first day of November, A. D. 1898.

Certificates of new stock will be dated November 15, 1898, and be issued in mail upon that date to stockholders of record, November 1, 1898."

That complainants as trustees received 150 shares of the Pullman Palace Car Company of the par value of $100 each, being one share for each two shares held by them, aggregating a par value of $15,000. That at a meeting of the stockholders of the Pullman Loan & Savings Bank, held December 29, 1898, the following resolution was adopted :

" Whereas, the capital stock of this bank is now $100,000, and the surplus account $100,000, and the undivided profits $109,145.20,

It is resolved, that the capital stock be increased from $100,000 to $200,000, and that the sum of $100,000 be transferred from surplus and undivided profit accounts to capital stock, and that a stock dividend of 100 per cent be paid on January 10, 1899, to stockholders of record at the close of business December 31, 1898."

That thereafter complainants, as trustees, received from the Pullman Loan & Savings Bank fifty shares of the capital stock thereof at the par value of $100 each, being one share for each share held by the complainants as trustees, making an aggregate at par value of $5,000.

That on March 12, 1900, the Chicago Telephone Company adopted the following resolution :

" Resolved, that a dividend of $1,000,000 be and hereby is declared payable on April 10, 1900, to stockholders of record at 12 M. on the 31st day of March, 1900, in certificates of stock at the par value of $100; no fractional shares to be issued; the fractions arising from such dividends shall be aggregated and sold under the directions of the executive committee in even shares at the best obtainable price,

and the proceeds divided among the stockholders entitled to fractions *pro rata* to such respective fractions."

That complainants, as trustees, received from the Chicago Telephone Company, seventy-one shares of the capital stock thereof, of the par value of $100 each, being one share for each five shares of stock held by complainants, aggregating at par value $7,100.    That on January 23, 1901, the Chicago Telephone Company adopted the following resolution:

"Resolved, the treasurer be and hereby is instructed to offer for subscription at par, 10,000 shares of the authorized unissued stock of the Chicago Telephone Company to stockholders of record on the company's books at the close of transfer books March 27, 1901, *pro rata* to their respective holdings.  No fractional shares shall be subscribed for or issued; the fractions arising from such *pro rata* aggregate, shall be sold under the direction of the executive committee in even shares for the best obtainable price, and the premium realized divided among the stockholders entitled to the fractions *pro rata* to said respective fractions. The stock subscribed for under this resolution, must be paid for on or before April 3, 1901, at the office of the treasurer of the company, 203 Washington street, Chicago, Illinois, and the stock certificates may be issued April 8, 1901.  Any portion of the total number of shares offered for sale which may remain unsubscribed for on April 3, 1901, may be sold under the direction of the executive committee and the proceeds paid into the treasury.  The right of a stockholder to subscribe for stock offered hereunder, shall be considered as waived and shall be lost in any case where the stockholders' written subscription with payment in full for the share to be issued April 8, 1901, is not received at the office of the treasurer before the close of business April 3, 1901.  In any case in which default in payment in the subscription shall be made, the company may, at the option of the executive committee, declare such subscription waived and the rights thereunder lost, and the shares not paid for may be sold under the direction of the executive committee and the proceeds paid into the treasury."

That complainants as trustees were thereby given the right to subscribe at par for fifty-three shares of the capital stock upon payment of $5,300; that they thereupon sub-

scribed for fifty-three shares and paid therefor $5,300. That on May 29, 1901, said Chicago Telephone Company passed the following resolution:

" Resolved, the treasurer be and is hereby instructed to offer for subscription at par 10,000 shares of the authorized or unissued stock of Chicago Telephone Company to stockholders of record on the company's books at the close of transfer books September 26, 1902, *pro rata* of their respective holdings. No fractional share shall be subscribed for or issued. The fractions arising from such *pro rata* aggregate, shall be sold under the direction of the board of directors or the executive committee in even shares for the best obtainable price, and the premium realized divided among the stockholders entitled to fractions *pro rata* of such respective fractions. The stock subscribed for under this resolution must be paid for on or before October 1, 1901, at the office of the treasurer of the company, 203 Washington street, Chicago, Illinois, and stock certificates may be issued October 9, 1901."

That complainants, as trustees, pursuant to said resolution of May 29, 1901, subscribed for fifty-three shares of the capital stock of said corporation for which they paid $5,300.

That on May 18, 1899, the said Chicago Telephone Company passed the following resolution:

" Resolved, that the treasurer be instructed to sell 6,635 shares of the authorized but unissued stock of the Chicago Telephone Company at par to stockholders of record at the close of the books May 31, 1899, *pro rata* to their respective holdings; no fractional shares to be issued. The fractions arising from such *pro rata* shall be sold by the executive committee in even shares for the best obtainable price and the premium realized divided among those stockholders entitled to fractions *pro rata* to their respective fractions. Stock allotted by virtue of this resolution must be paid for on or before January 24, 1899, certificates to be issued July 1, 1899. Any portion of the same which shall not have been paid for by any stockholders as above, may be sold by the executive committee for the best obtainable price and the proceeds thereof paid into the treasury of the company."

That complainants as trustees pursuant to said resolution and the rights given them, subscribed for forty-nine shares of the capital stock of said corporation, for which they paid $4,900.

That on December 4, 1901, the Chicago Telephone Company passed the following resolution :

" Resolved, that the treasurer be and is hereby instructed to offer for subscription at par, thirty thousand (30,000) shares of the authorized but unissued capital stock of Chicago Telephone Company to stockholders of record on the company's books at the close of transfer books at 3 P. M., January 11, 1902, *pro rata* to their respective holdings."

That under said resolution complainants, as trustees, were given the right to subscribe at par for —— shares of the capital stock of the said corporation, for which they paid $——.

That at a meeting of the directors of the Chicago, Rock Island & Pacific Railway Company, held May 31, 1898, a resolution was adopted by said directors, directing the distribution of 46,156 shares of the capital stock of said corporation to stockholders of said corporation of record at that date, and that thereby each stockholder of said corporation became entitled to one share of said capital stock for each ten shares held by each stockholder, respectively, as a special dividend of said corporation, and that complainants, as trustees, received ninety shares of the par value of $100 each, aggregating at par value $9,000. An examination of the resolution, " Defendants' Exhibit 11," shows that this distribution of stock was in payment of certain addition and improvement bonds of the company, dated June 1, 1881, June 7, 1882, June 6, 1883, and June 3, 1884. These addition and improvement bonds and the resolution authorizing them, appear in the record.

The transaction as shown by the resolution of 1881-2-3-4, and the resolution of May 30, 1898, appears to have been as follows:

In 1881, $2,285,000 were taken from the income account of the company and placed to the credit of the " Addition and Improvement Account," as a temporary arrangement for the purpose of enabling the company to proceed with the work of construction, additions and improvements, before the sale of bonds and stock for the creation of the fund applicable to such purpose.

The company issued its addition and improvement bond No. 1 for the $2,285,000, payable to the treasurer, as trustee, in ten years, either in lawful money, " or with full paid shares of capital stock, as it shall at that time elect." It also provided that " when this bond is paid, the proceeds of such payment shall be distributed to those who shall at the time be stockholders of said company in the proportions which the number of shares held by them severally shall at the time bear to the whole number of shares of the capital stock of said company then outstanding."

The addition and improvement bonds issued in 1882–3 and 4, were identical in terms with those issued in 1881.

That on June 5, 1901, said Chicago, Rock Island & Pacific Railway Company gave each shareholder the right to subscribe for sundry new shares of its stock at $100 per share; that said capital stock was worth largely in excess of $100 per share and each stockholder had the option to buy said new stock or sell the same in the market; and said rights to subscribe for such new stock had a cash market value; that complainants, as trustees, were given the right to subscribe for ninety-eight shares of said new stock, and in the exercise of their discretion, deemed it wise to sell said rights, to subscribe for said new stock of the said corporation belonging to the stock owned by them as trustees aforesaid, and being part of said residuary estate, and did make sale thereof and received therefor $4,410.

That at a meeting of the board of directors of New York Central and Hudson River Railroad Company on October 23, 1899, the following resolution was passed :

" Resolved, that in order to provide for the costs of additional rolling stock it is advisable that the capital stock of this company be increased from the present amount of $100,000,000 to $115,000,000."

" That stockholders be entitled to subscribe for such increased stock at par to the extent of fifteen per centum of their respective holdings," etc.

Complainants, as trustees, were given the right to subscribe for sixty shares of said new stock and subsequently sold said rights to subscribe and received therefor $2,249.30 cash.

That complainants, as trustees, having some funds on hand, bought seventy shares of the capital stock of the Illinois Central Railroad Company, for which they paid $8,583.75.

That on January 26, 1901, the stockholders of said railroad company passed the following resolution:

" That in order to provide the necessary moneys for the purchase of additional cars and locomotive engines needed for the accommodation of the growing traffic on the company's lines of railway, the construction of additional second tracks, side tracks, and station and terminal facilities, the reduction of grades, the elimination of grade crossings at different places along said railway lines, and other improvements of a permanent character, some of which purchases, additions and improvements have already been undertaken, and for other corporate purposes, the capital stock of the Illinois Central Railroad Company be increased by an issue of 60,000 new shares of $100 each, from 600,000 shares to 660,000 shares of $100 each, thus making the whole capital stock of the company $66,000,000.

" Second :    That each shareholder shall have the privilege of subscribing at par on or before March 4, 1901, for one share of such new stock for every ten shares of stock registered in his name on the transfer books of the company at the close of business on December 20, 1900, and for fractions of shares in like proportion; payment for the new stock to be made in full at the company's office in the city of New York, on or before Monday, March 4, 1901."

That on October 16, 1901, the ·stockholders of said railroad company passed the following resolution :

" Resolved, (1) that the shareholders of this corporation do hereby approve of and adopt the proposition now under consideration in manner and form as the same is set forth in the notice of the meeting as read by the secretary, and that the capital stock of the company be increased by a new issue of 132,000 new shares from 600,000 shares of $100 each, to 792,000 shares of $100 each, thus making the whole capital stock of the company $79,200,000.

" Resolved (2) that each shareholder as registered upon the company's books on Wednesday, October 30, 1901, shall until Wednesday, November 27, 1901, and no longer, have the privilege of subscribing at par for one share of such new stock for every five shares of stock so registered

in his name, and for fractions of shares in like proportion. payment for the new stock to be made in full at the company's office in the city of New York on or before Wednesday, December 18, 1901."

That the proposition referred to in said resolution as approved and adopted is in part as follows:

" That in order to provide the necessary moneys for the purchase of additional cars and locomotive engines needed for the accommodation of the growing traffic on the company's line of railway, the construction of additional second tracks, side tracks, and station and terminal facilities, the reduction of grades and changes of alignment, the elimination of grade crossings at different places along said railway lines, and other improvements of a permanent character, some of which purchases, additions and improvements have already been undertaken, and for other corporate purposes, the capital stock of the Illinois Central Railroad Company be increased."

That complainants, as trustees, pursuant to said resolution of January 26, 1901, having seventy shares, were entitled to subscribe for seven shares on February 14, 1901, and paid therefor $700; that having then seventy-seven shares they were entitled under said resolution of October 16, 1901, to subscribe for fifteen and two-fifths shares; that accordingly they subscribed for fifteen shares and paid therefor $1,500; that they then received for the fractional two-fifths right the sum of $54.15.

It therefore appears that said trustees have received from the different corporations three different kinds of dividends, beside the ordinary current dividends paid on the different stocks.

First.    Cash dividend of twenty per cent paid by Pullman Palace Car Company under its resolution of July 1, 1898.

Second.    Stock dividend of the same company paid under resolution of October 18, 1898.

The stock dividend of the Chicago, Rock Island & Pacific Railway Company.

The stock dividend of the Pullman Loan & Savings Bank.

The stock dividend of the Chicago Telephone Co.

Third.  The rights and privileges of subscribing to the capital stock of the following corporations:   Chicago, Milwaukee & St. Paul Railway Company; Chicago, Rock Island & Pacific Railway Company; New York Central & Hudson River Railroad Company; Chicago Telephone Company; Illinois Central Railroad Company.

Complainants contend that all said dividends and rights go as net income to the life tenant.  Defendants contend that all the distributions of stock and stock dividends and rights to subscribe form a part of the capital of the trust fund, and that the trustees are not authorized to deliver them to the tenant for life.

It was the opinion of the master to whom the case was referred, that the extraordinary cash dividend of twenty per cent, declared by the Pullman Palace Car Company July 1, 1898, upon the stock held by the trustees of the estate and amounting to $6,000, was " net income " payable under the twelfth clause of the will to the life tenant; but that the stock dividends of the Pullman Palace Car Company, the Pullman Loan and Savings Bank, the Chicago Telephone Company and the Chicago, Rock Island & Pacific Railway Company, together with all the rights and privileges to subscribe at par for additional capital stock issued by certain corporations as hereinbefore stated should be considered as constituting a part of the capital of the trust fund, belonging to the remaindermen, the life tenant being entitled only to the net income therefrom.

The Circuit Court hearing the case upon exceptions to the master's report, entered a decree finding that not only the said cash dividend but also the stock dividends constituted " net income " under the twelfth clause of the will, and were the absolute property of the life tenant. But the decree finds that the " rights to subscribe " for additional capital stock constitute a part of the capital or *corpus* of the trust estate and belong ultimately to the remaindermen.

It appears from the record that the extraordinary cash

and the stock dividends were all declared and paid over to the executors under the will before the estate was settled in the Probate Court or turned over to the trustees, and it is said they were substantially all earned during the lifetime of the testator. The stock distribution of the Chicago, Rock Island and Pacific Railway Company was made, it is said, before the will was admitted to probate.

OTIS & GRAVES, attorneys for appellants; E. A. OTIS, of counsel.

All cash dividends, whether large or small, are income, and belong to the tenant for life, while all stock dividends whenever earned, and however declared, are capital and belong to the remaindermen. Waterman v. Alden, 42 Ill. App. 294; s. c., 144 Ill. 90; Minot v. Paine, 99 Mass. 101; Gibbons v. Mahon, 136 U. S. 549; Richardson v. Richardson, 75 Me. 570; Davis v. Jackson, 152 Mass. 58; Brown & Larned, Petitioners, 14 R. I. 371; Millen v. Guerrard, 67 Ga. 284; Mills v. Britton, 64 Conn. 4.

DAVID FALES, attorney for appellees.

The cash dividend is income and belongs to the life tenant. Even in those jurisdictions where the most conservative rules have been followed, such dividends have been considered income and have been awarded to the life tenant. Am. & Eng. Enc. of Law, 2d Ed., Vol. 9, pp. 710–713; Cook on Stock, etc., Sec. 552 et seq.; Bates v. MacKinley, 31 Beav. 280; Richardson v. Richardson, 75 Me. 570; Minot v. Paine, 99 Mass. 101; Johnson v. Johnson, 15 Jur. 714; Perry on Trusts, Sec. 544; Reed v. Head, 6 Allen, 174; Leland v. Hayden, 102 Mass. 542; Waterman v. Alden, 42 Ill. App. 495.

The stock dividends are all dividends of the earnings and income of the corporations, and belong to the life tenant. Lowry v. Farmers' Loan & Trust Co., 172 N. Y. 137; Thompson, Commentaries on Law of Corporations, Vol. 2, Secs. 2192 and 2193; Cook on Stock, etc., Sec. 552 et seq.; Clarkson v. Clarkson, 18 Barb. 646; Riggs v. Cragg, 26

Hun, 89; Goldsmith v. Swift, 25 Hun, 201; Estate of Kernochan, 104 N. Y. 618.

A stockholder has no legal nor equitable title to the surplus earnings, income or profits of a corporation until the declaration of a dividend.   The stockholder has no title to the property of the corporation, even though one man owns the entire stock.   Until dividends have been declared a stockholder has no right of action at law or equity to recover any part of the fund applicable to that purpose. Cook on Stock, etc., Sec. 545; Morawetz on Cor., Secs. 450, 451 *et seq.;* Greeff v. Equitable Life Assurance Society, 160 N. Y. 19; Burden v. Burden, 159 N. Y. 287; Jermain v. Lake Shore, 91 N. Y. 483; Park v. Grant Locomotive Works, 40 N. J. Eq. 114; Button v. Hoffman, 61 Wis. 20; Queen v. Arnaud, 9 Ad. & El. N. R. 806; Browne v. Collins, L. R. 12 Eq. Cas. 594.

MR. JUSTICE FREEMAN delivered the opinion of the court.

This is a suit brought by the trustees of the estate of John DeKoven, deceased, who ask the aid of the court in construing certain provisions of his will, wherein the " rest and residue " of his estate is given to them in trust " to hold, invest, rent, manage and care for the same, and to pay the net income thereof " to the testator's wife " during her life, so long as she remains unmarried, and upon her death or remarriage" to divide such rest and residue between the appellants herein, if living at the expiration of the wife's life tenancy.   There is no controversy as to the facts, and such of them as may be deemed necessary to an understanding of the questions of law involved are set out in the foregoing statement.

The testator died April 30, 1898.   He left as part of his estate, shares of stock in a number of corporations, which have since his death declared, in one case an extraordinary cash dividend, in others stock dividends, and in others stock dividends and rights to subscribe at par for new issues of stock.   The question has arisen whether any or all of these dividends and rights are to be considered " net income " within the meaning of the provision of the will

above referred to, payable to the testator's wife as the life tenant, or whether they constitute a part of the capital or body of the estate, which by the will is, upon the expiration of the life tenancy, to be divided between the appellants as remaindermen.

The dividends and rights arrange themselves in three classes. To the first of these belongs the extraordinary cash dividend of twenty per cent declared July 1, 1898, upon 300 shares of the capital stock of the Pullman Palace Car Company. This dividend of twenty dollars per share was paid in cash, amounting to $6,000, and it is to be determined whether this is payable under the will to the life tenant as net income, or to the remaindermen as a part of the *corpus* of the estate. The money out of which it was paid appears to have been earned, for the most part at least, during the lifetime of the deceased, and to have been retained by the company as surplus assets. It had never been added to the capital of the corporation, but had remained in the company's treasury as undistributed earnings. It had not become the property of the testator during his lifetime. While it remained in the company's treasury it was subject to such uses as the directors might see fit to make of it for corporate purposes. Its ownership was in the corporation. This is well settled, and is conceded by counsel. In Gibbons v. Mahon, 136 U. S. 519–557, the court, by Mr. Justice Gray, says: " The distinction between the title of a corporation and the interest of its members or stockholders in the property of the corporation is familiar and well settled. The ownership of that property is in the corporation, and not in the holders of shares of its stock. The interest of each stockholder consists in the right to a proportionate part of the profits whenever dividends are declared by the corporation, during its existence under its charter, and to a like proportion of the property remaining upon the termination or dissolution of the corporation after payment of its debts. (Citing a number of authorities.) Money earned by a corporation remains the property of the corporation, and does not

become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business, or as an addition to its capital." To the same effect is Minot v. Paine, 99 Mass. 101, where it is said (p. 106): "The net earnings of a railroad corporation remain the property of the company as fully as its other property till the directors declare a dividend. A shareholder has no title to them prior to the dividend being declared." Hyatt v. Allen, 56 N. Y. 553; Greeff v. Equitable Life Assurance Society, 160 N. Y. 19–32. Applying the principle in the present case, no part of the earnings of the Pullman Palace Car Company out of which the extraordinary cash dividend under consideration was paid had become a part of the testator's estate at the time of his death, no matter when they had been earned by the company. If the dividend had been paid to the testator in his lifetime, it would have been received by him as income from his stock investment. It did not become anything else when received by the trustees of his estate in the form of an extra dividend, after his decease. It was still income, like other dividends, and as such it is payable to the life tenant under the provisions of the will.

This conclusion is in accord with what we regard as the greater weight of authority, and with what is said in Waterman v. Alden, 42 Ill. App. 294–319. Reference is there made to the earlier English cases in which it was held that extraordinary dividends and bonuses belonged to the remainderman as accretions to the capital, and it is said that "in later cases the English courts refused to follow that rule, and cash dividends, whether ordinary or extraordinary, and bonuses declared out of the profits, were held to belong to the income tenant." (See cases there cited.) The conclusion of the court in that case is thus stated: "The profits were income, in the absence of an affirmative binding act on the part of the bank changing their character, and it was immaterial whether they were earned by the bank in the lifetime of the testator or after his death."

These views appear to have been concurred in by the Supreme Court in Waterman v. Alden, 144 Ill. 90. See, also, Davis v. Jackson, 152 Mass. 58. It is not seriously disputed by counsel for appellants that the life tenant is entitled to this extraordinary cash dividend as income of the estate.

No good reason appears for depriving the life tenant of this cash dividend declared and paid on stock which became a part of the trust estate, in view of the fact that the testator gave to her all the net income of his estate without reference to when such income was paid or received.

The second of the questions presented relates to another class of so-called dividends paid by the issue of certificates of stock and known as "stock dividends." These were declared by four of the corporations in which the trust estate was the holder of capital stock. The Pullman Palace Car Company, in 1898, increased its capital stock fifty per cent and issued new stock to that amount representing earnings of the company added to its capital. This new issue of stock was distributed to its stockholders of record in the ratio of one share for each two shares before outstanding. The trustees of the testator holding 300 shares of stock in said company received 150 shares of the new issue, of a par value of $100 a share fully paid. In like manner the Pullman Loan and Savings Bank in December, 1898, increased its capital stock from $100,000 to $200,000, paying for the same out of its surplus and undivided profits, and declaring a stock dividend of 100 per cent, of which the estate holding fifty shares of the original issue became entitled to and received fifty additional shares of the par value of $100 each. In March, 1900, the Chicago Telephone Company, another of the corporations in which the estate was a shareholder, holding 355 shares of its stock, declared a stock dividend, so called, of which the estate received seventy-one shares of the par value of $100 each. And lastly, the Chicago, Rock Island and Pacific Railway Company, in which the estate was the holder of 900 shares of capital stock, directed, in May, 1898, the distribution of 46,156 additional shares to its stockholders of record, in the proportion of one new share for

each ten shares previously held; and the estate received ninety shares of the new issue of the par value of $100 each. It appears from a resolution adopted by the directors of the last named company, that the stock so distributed was issued in payment of certain addition and improvement bonds. These were dated in 1881, 1882, 1883 and 1884, and were issued to the treasurer of the company to evidence, apparently, a debt from the company to itself for money taken from income account as a temporary arrangement to enable the company to proceed with certain additions and improvements before the creation, by the sale of bonds and stock, of a fund for such purpose. These bonds were payable to the treasurer as trustee, either in lawful money or " with full paid shares of capital stock," as the company might at the time elect, to be distributed to those who should then be stockholders. The company elected to pay with an issue of full paid stock. This stock represented, therefore, earnings of the company which had been invested in its plant and become a part of its capital.

These stock dividends were all, it will be seen, substantially of the same character. In no case was the stockholder allowed an option to take a money dividend instead of stock. In this respect the facts differ from those in Waterman v. Alden, 42 Ill. App. 294, above referred to. These stock dividends are claimed in behalf of the life tenant as " net income," and in behalf of the remaindermen as a part of the capital to be held in trust for their benefit.

It is urged in behalf of appellants that it was not the meaning and intent of the testator, ascertained as it must be from the whole will and all its parts (Harrison v. Weatherby, 180 Ill. 418), that the net income payable to the life tenant should include future stock dividends. This, however, must depend on whether such dividends are, or not, " net income " of the trust estate. The life tenant is entitled to all such " net income " no matter in what form it may be received, but not to any portion of the capital.

There is a wide and irreconcilable difference of opinion

between courts whose opinions are entitled to respect, as to whether stock dividends, so called, are to be regarded as income to which a life tenant is entitled, or as merely representing capital to be held in trust for the remaindermen. Some of these cases seem, however, to have turned in some measure upon the intent of the testator derived from the language used in creating the trust estate or from the facts and circumstances of the particular case. This seems to be true of two leading cases in the Court of Appeals of New York, cited by appellee's counsel—McLouth v. Hunt, 154 N. Y. 179, and Lowry v. The Farmers' Loan & Trust Company, 172 N. Y. 137. In Cook on Corporations (Chap. 32, Sec. 353, *et seq.*), it is pointed out that there are "three well defined rules upon this subject which may be denominated the American or Pennsylvania, the Massachusetts, and the English rule." The first of these is to the effect that when the fund out of which an extraordinary stock or property dividend is to be paid was accumulated by the corporation before the life estate arose it should be held to be principal belonging to the *corpus* of the estate; but if earned after the life estate arose then the dividend should be deemed income, and go to the life tenant. The Massachusetts rule regards all cash dividends, large or small, as income, and stock dividends, whenever earned and however declared, as capital. The English rule as it was originally stated treated extraordinary cash or stock or property dividends as belonging to the *corpus* of the trust; but later English decisions are to the effect that extraordinary cash dividends may be decreed to the life tenant. The general subject and the authorities are well considered by the United States Supreme Court in Gibbons v. Mahon, *supra*, to which reference may be had. The conclusion reached in that case is that stock dividends declared as in the case at bar go to the remainderman. This rule is, we think, supported by sound reasoning and sustained upon principle by the greater weight of authority. Spooner v. Phillips, 62 Conn. 62; Mills v. Britton, 64 Conn. 4; Brown & Larned, Petitioners, 14 R. I. 371; Richardson v. Richardson, 75 Me. 570; Millen v. Guerrard,

67 Ga. 284; Bouch v. Sproule, L. R., 12 Appeal Cases, 385–397.

A dividend is defined as "a corporate profit set aside, declared and ordered by the directors to be paid to the stockholders on demand or at a fixed time. Until the dividend is declared these corporate profits belong to the corporation, not to the stockholders, and are liable for corporate indebtedness." Cook on Corporations, Chap. XXXII, Sec. 534. A stock dividend "is lawful when an amount of money or property equivalent in value to the full par value of the stock distributed as a dividend has been accumulated and is permanently added to the capital stock of the corporation. * * * In this country these dividends are frequently made, and are constantly sustained by the courts." *Idem*, Sec. 563.

There is a clear distinction between an extraordinary cash dividend no matter when earned, and stock dividends declared as in the case at bar. The one is a disbursement to the stockholder of accumulated earnings, and the corporation at once parts irrevocably with all interest therein. The other involves no disbursement by the corporation, which parts with nothing to the stockholder. The latter receives, not an actual dividend, but certificates of stock which evidence in a new proportion his interest in the entire capital, including such as by investment of accumulated profits has been added to the original capital. The differences of opinion as to whether this additional issue of stock is to be treated as income for the life tenant or capital to be held in reserve for the remainderman, grow out of the fact that such stock dividends undoubtedly represent additions to the original investment in the corporation. Hence they have been regarded, with what seems to us unsatisfactory reasoning, as income to the stockholder, whereas in fact they are not, as we view the matter, "income" to him, but represent additions to the source of his income, viz., his invested capital. The stockholder never receives these additions while the corporation continues its business. They do not go to him in any form; and hence the difficulty

we find in regarding them as income to him. A stock dividend gives the stockholder merely the evidences of additions made by the corporation to its own capital. He can, it is true, still retain the old stock certificates and sell the new ones, but by so doing he parts with so much of his interest in the capital of the corporation. The profit he may so derive is of the same nature that he would receive if no earnings had been added to capital and no stock dividend had been declared, but the market value of his stock should have arisen above par by reason of increased earnings and larger cash dividends declared thereon, and he should sell so much of it as represents the rise above its original par value. He would thus diminish his capital, although the earning power of what he has left might afterward equal that of his original investment. It is capital that he parts with. Fluctuations in market values of stock and in dividends therefrom constantly occur, regardless of whether the original capital has been increased by addition of accumulated profits or not.

Stock dividends add nothing to the capital of the corporation, nor to the capital of the stockholder. They may make it easier for the latter to dispose of a part of his interest. It was the addition made to the plant or capital of the concern out of earnings, which increased the value of his shares, and the stock dividends merely represent in a new form a part of what the original stock would otherwise represent. Income of a corporation is rarely if ever, all of it, income to the stockholder. Some of the earnings must go out for expenses of operation and for repairs. Without repairs a plant would naturally in time wear out, and the *corpus* or capital invested cease to earn dividends. What goes into repairs and what goes into permanent improvements or enlargements are alike added to the invested capital to maintain it unimpaired, or to increase its power to earn income for the stockholder. The life tenant as well as the remainderman profit by thus maintaining and improving the original investment. It would be as logical to award the life tenant a corresponding

interest in the original shares in proportion to whatever earnings or profits are expended for necessary repairs, as to award him or her the portion of such earnings or profits invested in permanent improvements or added to capital. Both repairs and such enlargements of capital come from the same source and are generally made for the same purpose, viz., to maintain or increase the earning capacity of the original investment.    It is, as we have said, within the power of a corporation acting within its charter powers, in good faith and with an honest purpose to protect the interests of all concerned, to determine for itself whether its earnings shall be applied to repairs, or to betterments, or to a fund for use in its business; and this regardless of whether its action may diminish for the time being the income of a life tenant or increase the estate of a remainderman.    " Profits on hand are valuable to the capital, and a right to share in them passes upon a sale or bequest; but they are the property of the corporation and may be applied to such uses as it may lawfully make of them." Waterman v. Alden, *supra* (p. 319).    In Minot v. Paine, *supra* (p. 107) the court says :    " It is obvious that if the directors had made no stock dividends, but had invested the income in permanent improvements, making no increase of the number of shares, the improvements would have been capital belonging to the legatees in remainder."

The precise question we are considering arose in the case of Gibbons v. Mahon, 136 U. S. 519, above referred to. We find no real distinction between the facts in that case, and those in the case at bar.    It is there said (p. 559) : " A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders.    Its property is not diminished, and their interests are not increased.    After such dividend as before, the corporation has the title in all the corporate property; the aggregate interests therein of all the shareholders are represented by the whole number of shares, and the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that

interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of new ones." It being within the powers of the directors of a corporation, acting, as we have said, in good faith, to determine in what manner accumulated earnings shall be applied, the nature of the interest of a life tenant and remainderman in such accumulated profits may be determined by such action; and as is further said in the case last cited, " ordinarily a dividend declared in stock is to be deemed capital, and a dividend in money is to be deemed income of each share."

The questions involved have been elaborately argued by counsel on both sides in the case before us, and we have carefully considered the cases cited which do not accept the conclusion we are compelled to adopt. We need not review them at length. In McLouth v. Hunt, *supra*, the New York Court of Appeals says: " For all corporate purposes the corporation may doubtless convert earnings into capital, when such power is conferred by its charter; but when a question arises between life tenants and remaindermen concerning the ownership of the earnings thus converted, the action of the corporation will not conclude the courts." Where, as in the case at bar, the corporation has thus converted earnings into capital, we know of no principle which can justify the courts in taking it away from the remaindermen, to whom the testator has left it by his will, and giving it to the life tenant, to whom the testator has left only the net income of such capital.

It is claimed in behalf of appellants herein that under the facts in this case these so-called stock dividends should still be considered a part of the trust fund for the benefit of the remaindermen, even though the Pennsylvania rule above referred to should be adopted, inasmuch as it is claimed that the earnings upon which the stock dividends were based, had accumulated before the testator's death. However that may be, we regard the difficulty in the application of that rule by a trustee as an obstacle to its application which in many cases would be insuperable. As said

by Mr. Justice Cartwright in Waterman v. Alden, before referred to, " no apportionment could be made without an examination of the accounts and transactions of the bank, and the courts refuse to enter upon such examinations, but regard dividends accruing at the time they are set apart." If, however, a rule should be applied which is laid down in the case of Lowry v. The Farmers' Loan and Trust Company, 172 N. Y. 137, where the same dividend of the Pullman Palace Car Company in controversy here was under consideration, the result should still be that under the undisputed facts in the case at bar the stock dividends, so called, must be regarded as representing a part of the capital belonging to the trust estate and not as income for the life tenant. In that case the New York court says: " That the value of the shares of stock has been lessened by a dividend, is a fact of no relevancy in determining the question of whether the dividend is to be regarded as income to the life tenant, or as capital to the remainderman. That question will be determined by the origin of the dividend. In this case a fund had been created by an accumulation of the net earnings of the corporation, and it remained a part of the general assets until, in the judgment of the directors, the time came when it was proper and prudent to distribute it among the stockholders. That which the directors of the corporation distribute among the stockholders, without intrenching upon capital, must be comprehended within the term ' profits,' and we should assume that the testator intended that what might be paid in that way should belong to the beneficiary. There is no question of increasing the capital for any corporate purpose or need. It was simply a mode of distributing the profits earned by the employment of capital." While we are compelled to differ from views thus expressed in that case for reasons we have before indicated, yet if we should agree with the above quotation the result would still be that the stock dividend referred to therein must in the case at bar be regarded not as an actual dividend, but merely as a distribution of evidences of capital which was already accu-

mulated by the corporation in the lifetime of the deceased, and was represented by the shares outstanding in his name at the time of his death. In other words, it formed a part of the *corpus* of his estate, the income of which only was left to the life tenant. To give to the life tenant in the case at bar these stock dividends would be to reduce by so much the value of the original *corpus* of the estate devised to the remaindermen, and would "intrench upon capital."

We conclude that the court must treat as capital that which by the action of the corporations referred to has in fact become such, and that the stock dividends under consideration belong to the *corpus* of the trust estate.

The third of the sources from which the trustees of the estate have derived funds with reference to which they ask the instructions of the court, are certain rights and privileges of subscribing to the stock of five of the corporations in which said trust estate is interested. By reason of their holding shares of the capital stock of such corporations, the said trustees were given rights to subscribe at par for a certain amount of the new stock to be issued by each of said corporations respectively, proportioned to the number of shares before held by the estate. Inasmuch as such new stock when issued had a market value greater than par, these rights to subscribe were salable at a premium. Some of them were accordingly sold by the trustees in the exercise of the discretion vested in them, and they received therefor sums aggregating several thousands of dollars. In the remaining two corporations the trustees availed themselves of the rights and did subscribe for such additional stock, paying therefor out of funds belonging to the estate.

Such rights to subscribe have been generally held to be incident to the ownership of the stock, and therefore capital to be added to the trust fund held for the remaindermen, the income of which goes to the life tenant. This is said to be "equally true whether the trustee subscribes for the new stock for the benefit of the trust or sells the right to subscribe for a valuable consideration. In either

Alsop v. DeKoven.

event the income goes to the *corpus.*"   Cook on Corporations, Chap. 32, Sec. 559; Atkins v. Albree, 94 Mass. 359; Biddle's Appeal, 99 Pa. State, 278; Eidman v. Bowman, 58 Ill. 444.   In the case last cited it is said : "When the company determine to increase their capital stock within the limits of their charter, each of the previous shareholders has the right to a proportionate amount of the new stock if it should be added to the old shares." We agree with the Circuit Court that these rights to subscribe and the proceeds of their sale belong to the trust fund.   We do not regard the case of Waterman v. Alden, *supra,* as holding to the contrary.   In that case it is said that " a surplus equal to the amount of new stock had been earned at testator's death.   The new stock was not issued as a stock dividend which stockholders were to take in that form, but the new stockholders were permitted to subscribe for the new shares of stock to the amount of their interest in the accumulated earnings, in lieu of a cash payment of that amount, so that they could take either stock or cash at their election."   There was therefore in that case neither a stock dividend declared, nor was there given a mere right to subscribe for the new stock.   In effect the stockholders received a cash dividend which they could invest in the new stock or not, as they chose.

For the reasons indicated we are compelled to regard as erroneous that part of the decree of the Circuit Court which finds the stock dividends of the Pullman Palace Car Company, the Pullman Loan and Savings Bank, the Chicago Telephone Company and the Chicago, Rock Island and Pacific Railway Company to be part of the net income of the estate.   The decree is therefore reversed and the cause will be remanded to the Circuit Court for further proceedings in accordance with the views herein expressed.