In the Matter of the Judicial Settlement of the Account of Proceedings of THE FARMERS' LOAN AND TRUST COMPANY, as Trustee under the Last Will and Testament of EDWIN NORTON, Deceased, and of the Construction of Said Will.

Surrogate's Court, New York County, April 19, 1927.

**Trusts — apportionment of stock dividend between principal and income — part of increased common stock without par value, exchanged at two and two-thirds to one for original stock, was extraordinary stock dividend — value of stock held as principal before and after exchange shows no impairment of principal — extraordinary dividend awarded to beneficiary.**

A corporation, a part of whose stock was held as principal of the trust fund herein, having accumulated a large surplus, amended its certificate of incorporation so as to authorize the issuance of no par value common stock in place

Surrogate's Court, New York County, April, 1927.      [Vol. 129

of par value common stock and specified the terms of " exchange "! to be at the rate of two and two-thirds shares of no par value stock for each share of par value stock held by the common stockholders. Notwithstanding the use of the word " exchange," the evidence, including resolutions, notices to stockholders and the transfer of surplus to capital, clearly establishes that the two-thirds of a share given in exchange was in fact a stock dividend.

Applying the rule in existence prior to the enactment of section 17-a of the Personal Property Law (Laws of 1926, chap. 843), that a stock dividend must be apportioned between the principal and income in such a manner as to leave the principal as represented by the shares of the stock held intact and unimpaired, it is found that the extraordinary stock dividend represented by the two-thirds share does not impair the principal of the trust fund, and, therefore, the beneficiary of the trust is entitled to the stock dividend.

ACCOUNTING proceeding involving construction of will. Affirmed on opinion of James F. Donnelly, referee.

*Geller, Rolston & Blanc* [*Charles Angulo* of counsel], for the Farmers' Loan and Trust Company, petitioner.

*Pendleton, Anderson, Iselin & Riggs* [*Lawrason Riggs, Jr.,* of counsel], for Lucy E. Norton.

*Benjamin F. Schreiber,* special guardian.

JAMES F. DONNELLY, Referee. This proceeding is brought by the Farmers' Loan and Trust Company for the purpose of having its account as trustee under the will herein judicially settled and also for the purpose of having the court construe the will herein and instruct the trust company trustee in respect to the proper distribution of certain shares of common stock of the Continental Can Company, Inc., received by said trustee in connection with the recent reorganization of said company and also in respect to certain stock dividends and rights to subscribe received by said trustee.

In and by the account filed herein in this proceeding the trustee has credited to the principal of the trust estate all of the stock received on reorganization and has apportioned between principal and income the stock dividends received and the rights to subscribe accruing on such stock dividends.

The questions which arise for decision herein relate to the trust of the residuary estate created pursuant to the 6th clause of the will. The testator, Edwin Norton, died a resident of the State of New York on December 31, 1914. By his will he bequeathed his residuary estate to the Farmers' Loan and Trust Company in trust to pay the income thereof to his wife, Lucy E. Norton, during her life and upon her death to divide the principal of said estate into five equal parts and hold one of said parts upon a separate trust

for each of testator's children, Arthur W. Norton, Sylvia Norton Conway, Evelyn Norton Seiler, Henrietta Norton Truesdell and Edwin Kenneth Norton, and to collect and receive the income of each such separate trust and pay the same over to the child of the testator for whom it had been set aside until the death of such child or the expiration of a period of twenty-one years, whichever event should first occur.

The trust also contains certain provisions in respect of the disposition of the principal of each of such trusts upon the termination thereof as hereinbefore provided, to the child of the testator for whom it was set aside or to his children. The testator authorized his executors and trustees to continue any investments which might have been made by him in his lifetime, and he further authorized them to sell, mortgage or lease any real estate of which he might die seized or which they might acquire after the testator's death.

The will further provided that in the investing and management of trust funds, the trustees should be governed by the laws of the State of New York, unless otherwise provided by the written request of the wife of said testator. It was, however, further provided that if the testator's wife made written requests to the trustees, such trustees should have the power to make investments in their discretion without reference to the laws of New York, and to retain any investments already made.

The testator left him surviving his widow, Lucy E. Norton, and his five children above enumerated.

Among the securities originally possessed by the trustee and which constituted a part of the principal of the trust there were 8,088 shares of common stock of the Continental Can Company, Inc. The company was incorporated under the Laws of the State of New York on January 17, 1913. On February 17, 1915, the testator's executrix sold 500 shares of said common stock, leaving 7,588 shares which were turned over to the trustee of the trust estate April 27, 1916.

On written petition of the beneficiaries under testator's will, to wit, of his widow and children, the trustee purchased 1,412 additional shares of the common stock of the Continental Can Company, Inc. This made the trust estate consist of 9,000 shares.

On February 21, 1918, the company declared a thirty-five per cent stock dividend. Under this arrangement every 1,000 shares of common stock then outstanding were increased to 1,350 shares of such stock, with a par value of $100.

From such stock dividend the trustee of the Norton estate received thirty-five per cent of 9,000 shares, or 3,150 shares of Continental Can Company, Inc., common stock. These 3,150

shares were apportioned as between the life tenant and the remainder-men: to the life tenant as income, 1,948 shares; to principal, and as such added to the trust estate, 1,202 shares. The trust estate was thereby increased so as to consist of 10,202 shares of par value Continental Can Company, Inc., common stock. These 10,202 shares were adjudged by a decree of this court entered October 6, 1920, to possess a corporate book value of $1,151,213.04, being the same value as before the stock dividend.

On December 7, 1922, the directors of the Continental Can Company, Inc., met and arranged for a special meeting of stockholders and adopted a resolution as follows:

" *Resolved* that Mr. T. G. Cranwell, President of the Company address a letter to the stockholders, accompanying the notice of stockholders' meeting to be held on December 29, 1922, giving an explanation setting forth the reasons underlying the calling of the special meeting of the stockholders."

Pursuant to that resolution, the president, on December 7, 1922, wrote to the stockholders a letter, part of which is as follows:

" * * * The reasons which underlie the calling of this meeting are the following:

" The Company has invested more than $7,500,000 of its earnings in the last seven years in the extension of its plants and other capital developments. $2,000,000 of this increased invested capital the Directors propose to provide by the sale of 20,000 shares of preferred stock which is available for that purpose. The remainder must be provided by the permanent capitalization of the profits so invested and, therefore, these profits cannot be distributed in cash at any time to the stockholders of the Company.

" The Directors feel that the common stockholders should have some tangible evidence of this additional worth of their stock. In other words, that these earnings which have been, in effect, capitalized should be represented in capital stock in the possession of the stockholders. It is, accordingly, proposed to show on the books the transfer of $4,500,000 from surplus to capital and to issue new stock to the stockholders based upon this additional capitalization.

" The Directors also believe that it will be advantageous to change the common shares of the Company from par value to no par value shares and to increase the number of shares so that each stockholder will have in effect two shares of stock for each share of stock which he now holds. This, together with the shares to be distributed on account of the transfer of surplus to capital will give to stockholders two and two-thirds shares of no par value stock for each share of common stock which they now hold.

" Finally, it is proposed to increase the amount of authorized common stock so that the Company may have available stock which can be sold to employees of the Company and which may be offered to the stockholders or distributed to the stockholders in future or otherwise disposed of as the requirements of the Company make desirable. Therefore, it is suggested that the total authorized capital be 500,000 shares of which 360,000 shares would be presently issued to stockholders, leaving 140,000 shares authorized but unissued.

" The foregoing plan has been formulated by the Directors after consultation with the holders of very large amounts of both the preferred and common stock of the Company. It is a plan designed to improve the position of both classes of stock. It is to be noted as to the preferred stock that the plan does not alter in any way its amount or preferences as now fixed by the certificate of incorporation. The preferred stock remains wholly unchanged, its possession, however, being improved 'by the additional common capital put back of it. The common stockholders will receive an increased number of shares in recognition of their surplus which is being capitalized and the new non par value character of these shares will, it is believed, permit of more ready reflection in market value of such increase in inherent worth as is anticipated.

" The foregoing plan is thus strongly recommended as being in interest of stockholders of both classes. In order, however, to carry it into effect, IT IS ESSENTIAL THAT IT BE AFFIRMATIVELY APPROVED BY A LARGE MAJORITY OF THE STOCKHOLDERS. ACCORDINGLY, YOU ARE URGENTLY REQUESTED TO SIGN AND RETURN THE ENCLOSED PROXY SO THAT YOUR STOCK MAY BE VOTED IN FAVOR OF THE PLAN. (Capitals in original.)   *   *   *

" The Company has had a prosperous year and our own audit of the first ten months' operation for 1922 shows about $3,000,000 profit, after providing for the dividend on the preferred stock for the entire year and setting up what I believe to be ample reserve for depreciation and taxes covering the first ten months. We consider this an excellent showing. The operations for November and December are not expected materially to affect the above showing."

Subsequent to this meeting and the issuance of the said letter, proxies were given and the meeting was held at Milbrook, Dutchess county, N. Y., on the 29th day of December, 1922. Stockholders holding 150,231 shares of common and preferred stock were represented by proxy. Mr. Arthur G. Chase, one of the officers of the company, holding 200 shares of common stock, was present in

person.   A formal resolution was adopted amending the certificate of incorporation.   This resolution is found in the account filed herein.

The purposes stated in the notice sent to stockholders for this special meeting were stated to be " (1) To amend the certificate of incorporation of the corporation pursuant to Section 24 of the Stock Corporation Law, so as to permit the issuance of shares without par value and so as to provide that the number of shares authorized to be issued is 75,000 shares of preferred stock (being the present authorized preferred stock of the corporation), and 500,000 shares of common stock without nominal or par value, and further to provide that the terms upon which the outstanding common shares of stock of the corporation are to be exchanged for the new shares are as follows: 1 share of common stock now outstanding of the par value of $100 will be exchanged for two and two-thirds ($2\frac{2}{3}$) shares of common stock without nominal or par value;  *  *  *;  so as to state the stated capital with which the corporation would carry on business; and so as to authorize the board of directors of the corporation to issue and sell such authorized shares of common stock with no nominal or par value as are not issued in place of the outstanding shares of common stock, for such consideration as from time to time may be fixed by such board."

The resolutions adopted at the meeting held December 29, 1922, at Milbrook, pursuant to such call, provided in substance that the certificate of incorporation of the company be amended pursuant to the provisions of section 24 of the Stock Corporation Law of 1909 (added by Laws of 1917, chap. 484, as amd. by Laws of 1921, chaps. 131, 694) " so as to change its common shares with nominal or par value including authorized but unissued shares of common stock into common shares with no nominal or par value."

In respect to the terms of issuance of the new shares of stock, said resolutions further stated: " That the terms upon which the new common shares without nominal or par value shall be issued in place of the old outstanding shares of common stock of the par value of $100 per share shall be as follows: One share of common stock now outstanding of the par value of $100 will be exchanged for two and two-thirds ($2\frac{2}{3}$) shares of common stock without nominal or par value  *  *  *."

The amended certificate issued and filed pursuant to such resolution and pursuant to section 24 of the Stock Corporation Law, provided, among other things, as follows:

" 9. The terms upon which the new shares, without nominal

or par value, shall be issued in place of the outstanding shares of common stock of the par value of $100 each shall be as follows:

" There shall be issued to the holders of the outstanding shares of common stock of the par value of $100, new shares of the common stock without nominal or par value at the rate of two and two-thirds (2⅔) shares of said new common stock without nominal or par value for each one share of the outstanding common stock of the par value of $100. each;     *     *     *.

" 10. The stated capital with which the corporation will carry on business will consist of the aggregate of the amount received by it as consideration for the issuance of its shares with no nominal or par value and the aggregate par value of all issued and outstanding shares having a nominal or par value and such additional amounts as from time to time may by resolution of the board of directors of the corporation be transferred thereto.

" 11. The board of directors of the corporation shall have power to issue and sell its authorized shares with no nominal or par value which are not issued in place of the outstanding shares of the common stock of the par value of $100 per share for such consideration as from time to time may be fixed by the board of directors of the corporation."

This amended certificate was immediately executed in New York city on the 29th day of December, 1922, and filed in the proper offices.

On the same day the board of directors of the corporation met and were informed of the result of the stockholders' meeting and of the execution of the amended certificate and adopted a resolution transferring $4,500,000 from surplus to stated capital. This resolution reads,   " *   *   *   There shall be transferred from the surplus of the Company to the stated capital with which the Company will carry on business an amount such that such stated capital of the company shall be $25,500,000 including the capital in respect of the $2,000,000 par amount of preferred stock of the Company which is this day being sold by the Company and also including capital in respect to preferred stock heretofore required by the Company for retirement pursuant to the provisions of the certificates in that respect."

The capital before the meeting had been $19,000,000, consisting of $13,500,000 par value shares of common stock and $5,500,000 par value shares of preferred stock. The new stock was issued in February, when 360,000 shares of no par value stock were issued to the stockholders, leaving 140,000 shares unissued.

After these corporate acts were completed, the trustee, the

Farmers' Loan and Trust Company, delivered the 10,202 shares of the old common stock of the Continental Can Company, Inc., to such company, and received therefor 27,205⅓ shares of the new common stock of the Continental Can Company, Inc.

The contention of the trustee herein is that the language of the notice of meeting, of the resolution, and of the certificate of amendment made pursuant to section 24 of the Stock Corporation Law of 1909 provided for an exchange of the old stock for the new, on the basis of one share of old common stock for two and two-thirds shares of new common stock, and that these corporate acts, having been denominated an exchange by these various instruments of action, the act thus becomes an exchange and cannot be considered in any other light. The trustee contends that the letter of December 7, 1922, which was the notice to stockholders describing the plan, is in contradiction of the resolutions and that the acts of the directors may not be impeached and must be accepted as having been done in good faith. The life beneficiary contends, on the other hand, that there was not in fact an exchange, but that 270,000 shares of the old par stock were issued two shares for one, and that 90,000 shares of the new stock issued constituted a stock dividend of two-thirds of a share on each share of the old stock. He contends that reading the letter of December 7, 1922, issued to stockholders, with the other instruments and with the resolution of the board of directors which transferred $4,500,000 of surplus to stated capital, that the entire plan described and set out in the letter of December 7, 1922, was carried out and made effective, and that reading such acts all together is not to contradict the acts of the directors, but to harmonize them.

The question for decision is whether this was an exchange or whether the entire transaction was partly an exchange and partly a stock dividend. The officers and directors of this corporation apparently intended in the new capital set up, created by virtue of section 24 of the Stock Corporation Law of 1909 to include in the capital behind the two and two-thirds shares issued in place of one share of old par value stock, and set up in capital account as part of the capital behind the new issue, the sum of $4,500,000 of profits which were theretofore accumulated in surplus account. They so advised the stockholders by their resolution of December 7, 1922, and the letter of President Cranwell issued pursuant thereto. They informed the stockholders that they were to put back or had invested in the property in excess of $7,500,000 of earnings, and that $2,000,000 of the increased invested capital was to be provided by the sale of 20,000 shares of preferred stock. They advised the

stockholders that the capitalization of the profits so invested would be permanent and that these profits could not be distributed in cash at any time to the stockholders. They expressed the opinion, however, that the stockholders should have some tangible evidence of the additional worth of their stock, and that the earnings capitalized should be represented in capital stock in the possession of the stockholders, and that they accordingly proposed to show on the books the transfer of $4,500,000 from surplus to capital and to issue new stock to the stockholders based upon this additional capitalization. They thought it would be advantageous to change the common shares from par value to no par value and to increase their number " so that each stockholder will have in effect two shares of stock for each share of stock which he now holds. This, together with the shares to be distributed on account of the transfer of surplus to capital, will give to stockholders two and two-thirds shares of no par value stock for each share of common stock which they now hold."

The suggested increase in capitalization was up to 500,000 shares of no par value " of which 360,000 would be presently issued to stockholders," leaving 140,000 shares authorized but unissued. The directors indicated that they had formulated a plan of new capitalization and recommended the plan in the interest of the stockholders, and requested its approval and inclosed a proxy urging the stockholders to sign, so that the stock might be voted in favor of the plan. Clearly the formal actions thereafter taken by the stockholders leading up to the amendment of the certificate and by the directors in the transfer of the surplus to stated capital to set up the sum of $4,500,000 behind the 500,000 shares of stock, 360,000 shares of which were then to be issued two for one, in accordance with the terms of the letter, and two-thirds of a share representing such transfer of surplus to stated capital, precisely carried out the plan outlined in the letter of the president. Taking out of the 360,000 shares of no par stock issued to the stockholders, the 270,000 shares which represent old par stock, two shares for one, and 90,000 shares which constitute a stock dividend of two-thirds of a share on each share of the old stock, these 90,000 shares are exactly one-quarter of the new stock, and $4,500,000 is exactly one-quarter of the stated capital to be found behind the common stock, excluding that part of the capital corresponding to the preferred stock. After the resolutions at the stockholders' meeting were passed and the amended certificate of incorporation was prepared and filed, and pursuant to section 10 of such certificate of amendment, the company transferred, by resolution of the board of directors, $4,500,000 of surplus to stated capital, and as part of the stated capital with

which the corporation was to carry on the business and representing such capital behind the new shares of no par value.

In his report to the stockholders for the year 1922 President Cranwell refers to the transfer of this $4,500,000 from surplus to capital account, showing that it was part of the stated capital behind the issue of new shares of no par value. Inasmuch as the old stock represented 135,000 shares and the two for one referred to in the letter of December 7, 1922, equals 270,000 shares and accordingly represents the exchange, the mathematical total of capital necessarily explains the rest of the transaction. The 90,000 shares would represent two-thirds of a share against the old outstanding capitalization, and these 90,000 shares, being exactly one-quarter of the new stock, represent the $4,500,000 drawn from surplus and set up in the new stated capital behind the common stock. These mathematical results show complete compliance with the letter of December seventh. The transfer of surplus to capital immediately upon the completion of the corporate acts performed at the meeting of the stockholders, shows the entire thing was a part of one transaction carried out step by step as it was required to be in accordance with the law and in accordance with the plan, and must be interpreted as it was stated to be in the letter, an exchange in part and a stock dividend in part. Unless we are to impute dishonesty and fraud to the holders of the proxies and a purpose and intent not to carry out the plan described in the letter, we must interpret the word " exchange " in the resolution to mean compliance with the plan, and while new shares were exchanged for old, part of the transaction was, strictly speaking, an exchange and the other part was, in fact, a stock dividend. It was not necessary that the dividend be called a stock dividend in order to make it such. The mere creation and issue of new shares of stock upon the basis of surplus assets which thus became converted into stated capital, amounts to a stock dividend without denominating it as such. (2 Cook Corp. [8th ed.] § 536; *Alsop* v. *De Koven*, 107 Ill. App. 190.)

A division of profits without the formality of declaring a dividend is the equivalent of declaring a dividend. (*Hartley* v. *Pioneer Iron Works*, 181 N. Y. 73; *Rorke* v. *Thomas*, 56 id. 559.)

The stockholders may agree among themselves informally to distribute a certain sum as dividends without going through the form of corporate action. A distribution of profits by unanimous consent without corporate action is legal. (*Barnes* v. *Spencer & Barnes Co.*, 162 Mich. 509, citing *Groh's Sons* v. *Groh*, 80 App. Div. 85; 2 Cook Corp. [8th ed.] § 534.)

Within the authorities cited, the corporate action taken sufficiently

indicated that the two-thirds of a share issued was in the nature of a stock dividend. It was so issued by unanimous vote of the stockholders through proxies given pursuant to a letter which indicated that there was to be such a stock dividend. It becomes unnecessary in this case to go behind the official action of the stockholders and directors or to violate those acts in any way. It is a mere matter of interpretation of what they intended and did, based upon specific evidence which clearly and completely establishes what they did and which is not inconsistent with what they said.

A formal resolution is not the only evidence of corporate action. (*Young* v. *U. S. Mortgage & Trust Co.*, 214 N. Y. 279.) Everything that was said and done, the entire setting of the occasion, may help in determining the authorization intended to be conferred and the purpose to be carried out and effected. (*Catholic F. M. Society* v. *Oussani*, 215 N. Y. 1.)

It having been determined that the action of the board of directors amounted to a stock dividend which was declared by them pursuant to a plan the previous steps of which were carried out necessarily before action was taken by such board, such stock dividend amounted to an extraordinary dividend. It should, therefore, be apportioned as between the life tenant and the remaindermen. (*Matter of Osborne*, 209 N. Y. 450, 484, 485.)

The rule for division there announced is as follows: " The proposition decided by us in this case is, that in all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the corpus of the trust to maintain that corpus unimpaired and the remainder thereof must be awarded to the life beneficiary. The method of accomplishing this result is not difficult. The intrinsic value of the trust investment is to be ascertained by dividing the capital and the surplus of the corporation existing at the time of the creation of the trust by the number of shares of the corporation then outstanding, which gives the value of each share, and that amount must be multiplied by the number of shares held in the trust. The value of the investment represented by the original shares after the dividend has been made is ascertained by exactly the same method. The difference between the two shows the impairment of the corpus of the trust. If the dividend is of money the amount of that difference is to be retained by the trustee as capital, and the remainder paid to the life beneficiary. If the dividend is in stock the amount of impairment in money must be divided by the intrinsic value of a share of the new stock, and the quotient gives the number of shares to be retained to make the impairment good — the remaining shares

going to the life beneficiary. Market value, good will and like considerations cannot be considered in apportioning a dividend."

It was determined by a decree of this court made October 6, 1920, that the original trust investment in common stock of this company had a total book value of $1,151,213.04 for 10,202 shares of par value common stock, constituting the corpus of the trust. This was represented at the beginning of this accounting period by 10,202 shares at the par value of $100, there having been originally 9,000 shares in the corpus of the trust, but in the intermediate period a stock dividend had been declared and apportioned between the life tenant and the remaindermen, which accounts for such increase. This book value of $1,151,213.04 represents the amount which must not be intrenched upon by any apportionment of extraordinary dividends. The estate received 27,205⅓ shares of new stock in place of the 10,202 shares previously held. Of these new shares, 20,404 shares received by the trustee constituted an exchange and were undoubtedly principal. The remaining 6,801⅓ shares represent the stock dividend to be paid to the life beneficiary or apportioned between the life beneficiary and the remaindermen, in accordance with the distributive rule cited. (*Matter of Osborne, supra.*) It, therefore, becomes essential to ascertain the book value of these 20,404 shares on December 31, 1922, after the payment of the two-thirds share stock dividend.

This book value is arrived at in the following manner:

| | |
|---|---:|
| Total stated capital............................ | $25,500,000 00 |
| Capital applicable to preferred stock........... | 7,500,000 00 |
| Capital applicable to common stock............ | $18,000,000 00 |
| Surplus....................................... | 3,225,796 87 |
| Total, for 360,000 shares.................... | $21,225,796 87 |

This is $58.96 a share, or a total book value for the 20,404 shares as of December 31, 1922, after the payment of the stock dividend, of $1,203,019.84, which shows no intrenchment on the trust investment. It follows that the entire extraordinary dividend of 6,801⅓ shares of no par value common stock belongs to and should be apportioned to the life tenant.

It has been stated in the argument advanced by the trustee and the special guardian that the rule in the *Osborne* case has led to a great deal of conflict and that it would be better for our Court of Appeals never to have announced the attitude which it took in reaching the conclusion there announced. It is argued that

it would have been better for our courts to have adopted the English rule (*Matter of Hopkins' Trusts*, L. R. 18 Eq. 696), under which increase of stock and stock dividends are allotted to the remaindermen, or to have followed the Federal rule announced by the Supreme Court. (*Eisner* v. *Macomber*, 252 U. S. 189.) It is also argued that the adoption of the so-called Pennsylvania rule, as announced in the *Osborne* case, has led to a great deal of confusion, so much so that the Legislature, by recent amendment to the Personal Property Law (§ 17-a [added by Laws of 1922, chap. 452, as amd. by Laws of 1926, chap. 843]), has provided that all stock dividends shall constitute principal of a trust, unless otherwise provided in the instrument creating the trust. This section of the law is only applicable to sales and deeds of trust executed subsequently to May 17, 1926, the date of the approval of the act, and while it may express a new public policy for this State, the rule of law which controls prior existing instruments has been announced and must be followed in deference to a proper protection of property rights. (*Matter of Osborne, supra.*) Undoubtedly, there is and should be an attitude of not unduly extending the principles there outlined, as the application of the rule has resulted in many confusions and obscurities. (*People ex rel. Clark* v. *Gilchrist*, 243 N. Y. 173.)

But the point is that the *Osborne* case has not been overruled or superseded, and while it remains the law it must be accepted and followed. Merely because the rule in the *Osborne* case has led to difficulty and has been superseded by legislative action to cover trusts created subsequent to May 17, 1926, this does not afford a substantial reason for a court of law to refuse to construe as such that which in fact amounted to a stock dividend. As long as the court is under a duty here to find that there was in fact a stock dividend underlying and constituting a part of the exchange of shares involved herein, the court may not accept what is denominated as the "form of the transaction" as controlling. In this case, both substance and form, when all the instruments are read together, clearly show that a stock dividend was intended and was included as part of the transaction.

I am of opinion, therefore, that the life tenant is entitled to the entire amount of shares issued by the Continental Can Company, Inc., on December 31, 1922, which represents the stock dividend made by such company, and that the 6,801⅓ shares thus issued constitute income which belongs to the life tenant. The account should be corrected accordingly.